STATE, Appellant, v. NIMROD, Respondent.

(138 N. W. 377.)

1. **Indians—Crimes Committed on Reservation—Bigamy—Jurisdiction.**

An Indian who has taken lands in severalty under Dawes Act (Act Feb. 8, 1887, ch. 119, 24 Stat. 388,) who has wholly abandoned the tribal relation, and has voluntarily taken up within the limits of the state his residence separate and apart from any tribe of Indians and has adopted the habits of civilized life, even though still under supervision of the Indian agent, thereby became a citizen of the United States, and of this state, and is amenable to the general criminal laws of the state, including bigamy, and as to all criminal offenses, including crimes committed by one Indian against another Indian, though committed within an Indian reservation, excepting only where acts of congress, by express provisions, in particular cases have made the laws of the United States applicable to such Indians.

2. **Indians—Crimes—Bigamy—Statutory Provisions.**

An Indian, who has become a citizen of the United States, though under supervision of the Indian agent, and who is charged with bigamy committed within the Yankton Indian reservation, is amenable to the general criminal law of this state, except where the acts of congress, by express provisions, have made the laws of the United States applicable; and such Indian may be prosecuted in the state courts, notwithstanding Act Cong. Feb. 2, 1903, ch. 351, 32 Stat. 793, conferring on the circuit and district courts of the United States jurisdiction over persons charged with enumerated crimes committed within Indian reservations, not including bigamy.

(Opinion filed October 25, 1912.)

Appeal from Circuit Court, Charles Mix County. Hon. R. B. TRIPP, Judge.

Joseph Nimrod, the defendant, was charged with bigamy committed on the Yankton Indian Reservation. From a judgment sustaining a demurrer to the information, the State appeals. Reversed and remanded.

*Royal C. Johnson,* Attorney General, *Ambrose B. Beck,* State's Attorney, and *G. M. Caster,* for Appellant.

From the allegations contained in the information, the cor-

rectness of which are admitted by the demurrer, the following facts appear of record:

(1)   That respondent is an Indian, and a member of the Yankton tribe of Sioux Indians.

(2)   That he was born within the territorial limits of the United States.

(3)   That prior to the commission of the alleged offense, he had received from the United States an allotment on the Yankton Indian Reservation pursuant to the Act of Congress of Feb. 8, 1887.

(4)   That the alleged offense of bigamy was committed upon deeded land for which a fee patent had been issued, although within the original boundaries of the Yankton Indian Reservation, and within Charles Mix county.

The foregoing facts appearing of record the decision of the Court in sustaining the demurrer on the grounds that the Court is without jurisdiction, must rest solely on the fact that the defendant and respondent is an Indian over which the state court has no jurisdiction; and that the state courts have no jurisdiction over an Indian for an offense committed within the original boundaries of an Indian reservation. Appellant contends that this proposition is against the law and is not supported by the authorities, but that on the other hand Indian allottees are citizens of the state and amenable to all its laws, unless jurisdiction has been ceded to the United States by legislative enactment.

Indian allottees are citizens.

It seems quite clear that if the respondent is a citizen of the United States and consequently a citizen of the state of South Dakota, that he is amenable to the laws of South Dakota, and that the state courts have jurisdiction of the respondent and of his alleged offense.

By the Act of February 8, 1887, Chapter 119, 24 Statutes at large, 318, the Congress of the United States provided for the allotting of lands to Indians within the various reservations within the United States; and in the same Act by Section 6, made the allottees citizens of the United States and consequently citizens of the various states and territories in which they resided. Section 6 of said act.

By the act of February 28th, 1891, Chapter 383, 26 Statutes

at large 794, same being an act to amend and further extend the benefits of the act approved February 8, 1887 entitled "An Act to provide for the allottment of land in severalty to Indians on the various reservations and to extend the protection of the laws of the United States over the Indian and for other purposes." Congress further conferred upon Indians allottees certain rights concerning the leasing of their allotted land and further recognizing the rights conferred upon the Indians by the previous act of February 8, 1887.

The appellant insists that under Section 6, of the Act of February 8, 1887, the defendant in this case was made a citizen of the United States and citizen of the State or Territory in which he resided provided he was born within the territorial limits of the United States. It will be noted from the information filed by the States Attorney that the respondent Joseph Nimrod is an Indian of the Yankton tribe of Sioux Indians. That he was born within the territorial limits of the United States and that he had received an allotment of land on the Yankton Indian Reservation in accordance with the provisions of the Act of Congress of March 8, 1887. The question now arises is respondent a citizen of the State of South Dakota and amenable to its laws relating to the offense of bigamy when committed within the borders of the Yankton Indian Reservation and within Charles Mix county. In re Now-Ge-Zhuck, 76 Pacific 877; State v. Williams, 43 Pacific, 15; In re Heff, 197 United States Reports, 506; United States v. Kiya, 126 Fed. 879.

Supporting the rule for which appellant contends, viz: That the Act of Congress of February 8, 1887, made all Indians born within the United States who received allotments of land and to whom trust patents for such allotments of land were issued citizens of the United States and of the state or territory in which they resided, and that thereafter they were amenable to the laws both criminal or civil of the state or territory in which they were made citizens, the following authorities are cited and we think fully support the rule indicated and established by the cases which we have cited above: State ex rel Thompson vs. Denoyer, 6 N. D. 586, 72 N. W. 1014; State ex rel Crawford v. Norris, 37 Neb. 299; 55 N. W. 1086; Wa-La-Note-Tke-Tynin v. Carter, 6 Idaho,

85, 53 Pacific 106; United States v. Rickard, 106 Fed. 5; Farrell v. United States, 49 C. C. A. 183, 110 Fed. 942; Hollister v. United States, 145 Fed. 773, 76 C. C. A. 337; In re Cellestine, 114 Fed. 551; United States v. Kopp, 110 Fed. 160; Boyd v. Nebraska, 143 U. S. 136-162-36 L. Ed.

Under the act of February 8, 1887, the tribal relations were eliminated and the Indians were given separate tracts of land designated as allotments for which a preliminary or trust patent was issued. It is true that thereafter for 25 years or for a longer period, if the president in his discretion so ordered the fee title to these allotments remained in the United States, but under this arrangement each Indian received his allotment separate and apart from the other members of the tribe. He had a certain tract of land over which he exercised exclusive dominion and upon which he might live, build his home, and which allotted land it was intended he should till and in every way use and enjoy as his own. It appears that the object of this arrangement was to encourage the Indians to engage in farming and adopt the habits, occupations and pursuits of the white man. We think that the authorities cited indicate clearly and beyond question that the allotting of lands under the said Act of February 8, 1887, clearly eliminated tribal relations and thereafter each Indian must be treated as having received his land in severalty and adopted the habits, customs and mode of living of the white man. The history of the federal government's dealing with the Indians in times past seems to bear out the proposition that those allotments have not been made or authorized where the Indians were not sufficiently civilized to be intrusted with the management, to at least a limited degree, of their own domestic and business affairs. Peano v. Brennen, 20 S. D. 345; Hollister v. U. S., supra.; In re Heff, supra.; In re Celestine, supra.

The federal courts are courts of limited jurisdiction.

The law seems to be well settled and there is an abundance of authority supporting the proposition that the federal courts are courts of limited jurisdiction receiving their powers solely by virtue of the enactment of statutes and their jurisdiction is clearly statutory. Newcombe et al. v. Burbank et al., 181 Fed. 334, 104 C. C. A. 164; In re Celestine, 114 Fed. 551; In re Burrus, 136 U. S. 586.

The federal courts being courts of limited jurisdiction whatever jurisdiction they may have over Indians upon the various reservations depends upon statutory enactment and whatever jurisdiction the federal courts might have over the respondent in this action depends upon statutory enactment. With reference to Indians and offenses committed by one Indian against another, the offense having been committeed upon deeded land the title to which had been conveyed by fee patent issued by the United States prior to the commission of the alleged offense we have been unable to find any authority supporting federal jurisdiction.

Constitutional and legislative provisions relating to Indians residing in South Dakota.

It seems quite clear from the enabling act and the Constitution of the state of South Dakota which formed the basis for statehood that jurisdiction was vested in the courts of this state over all citizens residing within the state when South Dakota was admitted into the union as a state and this jurisdiction extended over all of its citizens regardless of race or color and included all those Indians who were made citizens by the general allotment act of the federal government and if the state courts have lost or relinquished jurisdiction it must be due to legislative enactments subsequent to the passage of the enabling act providing for statehood and the adoption of the Constitution of the state of South Dakota.

Subdivision 5, of section 18, article 26, of the Constitution of the state of South Dakota provides as follows: "That jurisdiction is ceded to the United States over the military reservations of Fort Meade, Fort Randall and Fort Sully heretofore declared by the president of the United States, provided legal process, civil and criminal of this state, shall extend over such reservations in all cases of which exclusive jurisdiction is not vested in the United States and of all crimes not committed within the limits of such reservation."

Section 2 of the Political Code of the state of South Dakota relating to the sovereignity of the state provides as follows: "The sovereignity and jurisdiction of this state shall extend to all places within its boundaries as established by the Constitution and law subject only to such limitation and qualification of jurisdiction as have been or may hereafter be ceded by law to the United States."

Section 8, of the Political Code of the state of South Dakota

is as follows: "There shall be given and relinquished to the United
States and the officers and courts thereof exclusive jurisdiction and
authority to arrest, prosecute, convict and punish all persons whom-
soever who shall upon any Indian reservation within the state of
South Daokta commit any act in violation of the penal laws of the
United States and no costs or charges incurred in the courts of the
United States and the prosecution of offenses committed upon any
Indian reservation shall be chargeable to the state of South Da-
kota, provided this section shall be in full force and effect when-
ever the jurisdiction hereby relinquished shall be assumed by the
United States."

In 1901 the Legislature of the state of South Dakota passed
Chapter 106 of the Session Laws of 1901 being an act, ceding to
the United States of America jurisdiction over criminal offenses
committed upon Indian reservations within the state of South
Dakota, which is as follows:

"Section 1.   There is hereby relinquished and given to the
United States of America and the officers and courts thereof, ex-
clusive jurisdiction and authority to arrest, prosecute, convict and
punish all persons whomsoever who shall upon any Indian reser-
vation within the state of South Dakota commit any act in vio-
lation of the penal laws of the United States.

"Section 2.   No costs or charges incurred in the courts of
the United States in the prosecution of offenses committed upon
any Indian reservation shall be chargeable to the state of South
Dakota.

"Section 3.   This act shall be in full force and effect when-
ever the jurisdiction hereby relinquished shall be assumed by the
United States."

In accordance with the provisions of Chapter 106 of the
Session Laws of South Dakota for the year 1901, above quoted, the
United States congress passed the act of February 2, 1903, (32
Statutes, 793), being an act conferring jurisdiction upon the cir-
cuit and district courts for the district of South Dakota in certain
cases and for other purposes.   This act contains the following
provision which we consider decisive upon the question involved
in the case under consideration, to-wit:

"That the circuit and district courts for the district of South
Dakota are hereby given jurisdiction to hear, try, and determine

all actions and proceedings in which any person shall be charged
with the crime of murder, manslaughter, rape, assault, with intent
to kill, arson, burglary, larceny, or assault with a dangerous
weapon, committed within the limits of any Indian reservation
within the state of South Dakota.

By subsequent section proper punishment is provided
for the commission of the offenses enumerated in section 1 of the
act above quoted.

In view of the constitutional and statutory provisions cited it
seems clear that jurisdiction over all offenses committed on Indian
reservations was vested in the state of South Dakota when state-
hood was granted; and that whatever jurisdiction the federal
courts now have over offenses committed on Indian reservations is
due to the statutory provisions of South Dakota relinquishing to
the United States such jurisdiction, and the statutes of the United
States accepting such jurisdiction.

The Legislature of the state of South Dakota relinquished
jurisdiction to the United States conditionally; the condition being
that the state's jurisdiction should not cease until the federal gov-
ernment accepted jurisdiction.  The apparent object of this pro-
vision in the state statutes was to protect the people living upon
the reservations and grant them the protection of the state laws,
until such time as the federal courts took jurisdiction and ex-
tended the protection of the criminal courts of the United States
to those citizens residing upon Indian reservations in South Da-
kota.  It is a matter of common knowledge that much land upon
the various reservations of this state has been opened to home-
stead entry and thousands of white citizens have taken up the
residence upon Indian reservations and among the Indians.  It was
a wise provision on the part of the state legislature to reserve
jurisdiction and provide the protection of the state laws for these
people as well as the Indian citizens, until such time as the federal
government by statutory enactments saw fit to assume the burden.

By the act of February 2, 1903, congress partially accepted
the burden by accepting jurisdiction as to certain offenses,
but not as to all.  Appellant contends that jurisdiction over the
offenses mentioned in the act of February 2, 1903, passed to the
federal courts upon the passage and approval of the act, but as

to all other offenses jurisdiction' remained in the state courts. Hollister v. United States, 145 Federal, 45, 49 C. C. A. 183. Deeded land not a part of an Indian reservation.

The alleged offense with which respondent is charged, was committeed in the city of Wagner, upon deeded land for which the United States had prior to the commission of the alleged offense issued a fee patent and in which it had theretofore parted with all its right, title, and interest. Can it be said that after homestead proof has been made, and patent issued, and the land has become subject to taxation and subject to all the state law relating to property rights, that it still remains a part of an Indian reservation, simply because it lies within the borders of what was once a tribal Indian reservation. We think not. The United States had parted with its title and the Indians had parted with their title consequently the land upon which the offense was committed was no longer "Indian country." We have been unable to find any authority holding that the state courts have not full and complete jurisdiction over offenses committed upon patented or deeded land where absolute title has passed from the United States to a citizen of the United States and of the state. United States v. Forty Three Gallons of Whiskey, 93 U. S. 188; Bates v. Clark, 95 U. S. 204; United States v. Thomas, 47 Fed. 488; Hunt v. State, 4th Kansas, 60; State v. Sa-Coo-dacot, alias Yellow Sun, 1 Abb. U. S. 377, 1 Dill 271.

Is respondent amenable to the marriage laws of South Dakota.

If the respondent is a citizen of South Dakota, and has adopted the habits of civilized life he is amenable to the laws civil and criminal of this state. He has a right to vote, to hold office, and otherwise exercise the privileges of citizenship. He, by his vote, helps to levy taxes, incur public expense, and even change the Constitution of the state of South Dakota. Can it be said that he is clothed with all these rights and privileges, and yet has a right to live in adultery, or marry as many wives as he sees fit, and discard them at his pleasure without being liable to prosecution under the state law. Certainly not—such a condition would not be tolerated by any civilized community. However, the circuit court declined to pass on the question, basing its decision solely on the grounds that the court was without jurisdiction, and

we deem it unnecessary therefore to cite authorities on this question.

*H. D. James,* for Respondent.

The first and important inquiry is: Has the court jurisdiction? See, the Constitution of this state, Art. 5, Sec. 14; Sec. 2, of the Political Code.

The fifty-seventh congress, in pursuance of this cession of criminal jurisdiction to the United States by our state, passed this act, the act found in United States Compiled Statutes, supplement 1903, page 440. And see, Chap. 106, Session Laws, South Dakota, 1901, page 132.

We contend that the state has relinquished and given to the United States and its courts exclusive jurisdiction and authority to punish all persons committing any offense on an Indian reservation and jurisdiction having been assumed and accepted by the United States, and congress having made offenses committed on such reservations punishable by its courts, these Indian reservations are clearly within the express provision of section 2, of our Political Code, whereby it is provided that the state has no jurisdiction where there has been a cession of jurisdiction of these Indian reservations to the general government.

It is contended by counsel for appellant that the Act of Congress of February 2, 1903, (32 Stats. 793) passed in pursuance of the cession of jurisdiction of the state of South Dakota, heretofore referred to, being Chap. 106, of the Session Laws of the state of South Dakota, for the year 1901, that in assuming jurisdiction, congress only assumed jurisdiction over certain crimes enumerated in the Act of Congress assuming jurisdiction, to-wit: the crime of murder, manslaughter, rape, assault with intent to kill, arson, burglary, larceny, or assault with a dangerous weapon, and that in assuming jurisdiction congress did not assume jurisdiction of the crime of bigamy, and therefore, the state would still have jurisdiction of this crime.

We contend as did the learned trial court in deciding this case that the fact that congress did not mention the crime of bigamy and did not prescribe a punishment for the crime of bigamy committed on an Indian reservation in any way relates to the jurisdiction of the United States, but merely to the extent it has exercised it.

At the time Chap. 106, of the Session Laws of South Dakota, for the year 1901, was passed and the act of congress of February 2, 1903, was passed, the Indians residing upon these Indian reservations had not advanced to the state of civilization which many of them have attained in later years. Their marriage relations probably had been very lax, and on these reservations marriages consummated according to Indian custom were recognized, and in fact the laws of our state, being section 42, Chapt, 1, of the Revised Civil Code of our state, provides: "Indians contracting marriage according to the Indian custom and cohabitating as husband and wife are lawfully married."

While we do not find any specific statute in our state recognizing separation by Indian custom, yet at this time and for a great many years marriages and separations by Indian custom were recognized by the government authorities and by our courts, and it has only been during later years that many of the Indians have conformed to the laws of our state regarding marriage and separation ,and therefore, we think that it is not at all surprising that in assuming jurisdiction congress did not make more than the graver offenses and crimes among these people punishable in view of their uncivilized condition and also in view of the guardianship and supervision exercised over them by the government of the United States. State v. Campbell, 55 N. W. 553, 21 L. R. A. 169.

Our contention is that when the state ceded jurisdiction to the government of the United States they ceded all jurisdiction over crimes committed on Indian reservations, and that when the United States accepted this jurisdiction that said courts were deprived of further jurisdiction of crimes committed on this territory. There is another familiar principle that confirms this view, for as said by the Supreme Court of the United States in the case of the Kansas Indians, 5 Wall. 737, and many times since: "From necessity there can be no divided authority." It would never answer to have the United States and the state also legislating and enforcing their respective laws on the same or different subjects. Conflict and lawlessness, instead of peace and order, would exist under such circumstances.

We contend that it matters not what rights allottees of land may have acquired under the allotment laws, whether they have

acquired certain individual rights or not, that this would not in any way affect or could affect federal or state sovereignty or operate to release federal or state jurisdiction and cast it back again without its consent.

This question, however, has been decided and very fully discussed by the Supreme Court of the United States in the case of the United States v. Celestine, 215 U. S. 278, 54 L. Ed. 195, 30 Sup. Ct. P. 93.

As being in harmony with the views the court cites the following authorities: "United States v. Mullin, 71 Fed. 682; Rainbow v. Young, 88 C. C. A. 653, 161 Fed. 835; State v. Columbia George, 39 Or. 127, 65 Pac. 604, Re Columbia George, 201 U. S. 641, 50 L. Ed. 901, 26 Sup. Ct. Rep. 759; Couture v. United States, 207 U. S. 581, 52 L. Ed. 350, 28 Sup. Ct. Rep. 259; Toy v. Hopkins, 212 U. S. 542, 53 L. Ed. 644, 29 Sup. Ct. Rep. 416."

A decision of the Supreme Court of the United States is not only a high and presuasive authority, but it must be borne in mind that this is a federal question of which that court has appellate jurisdiction over the courts of this state and its decisions are absolutely controlling on the courts of the state.

On the subject of the power of congress, and the jurisdiction of the federal court of this state over Indians, the Federal Circuit Court of Appeals of this circuit, in the case of Hollister v. United States, 145 Fed. 773, 76 C. C. A. 337, also held: "Act. Cong. Feb. 2, 1903, c. 351, 32 Stat. 793 (U. S. Comp. St. Supp. 1905, p. 719) conferring jurisdiction on the federal district courts of the district of South Dakota to try prosecutions for larceny committed by any person on any Indian reservation within the state, was within the power of congress as an instrumentality employed in the discharge of a national duty to the Indians."

In line with the Celestine decision, 215 U. S. 278, and prior to the light and authority it gave, a number of other federal courts had substantially so decided under this 1885 act, and after considering this contention we cite: In re Blackbird, 109 Fed. 139; In re Lincoln, 129 Fed. 247; United States v. Logan, 105 Fed. 240.

The views above expressed by the Supreme Court of the United States have been re-affirmed in the late case of Tiger v. Western L. Co., 221 U. S. 286, 55 L. Ed. 738, 31 S. C. Rep. 578, and,

state and its decisions are absolutely controlling on the courts of the state.

McCOY, P. J. The defendant, Joseph Nimrod, was charged with the offense of bigamy, alleged in the information to have been committed as follows: "That Joseph Nimrod, on the 1st day of November, in the year of our Lord one thousand nine hundred and nine, at the county of Charles Mix, and state of South Dakota aforesaid, and at the city of Wagner, in said county of Charles Mix, state of South Dakota, within the boundaries of the original Yankton Indian reservation, and upon deeded land for which the United States had heretofore issued a patent in fee, and released all its title, rights, and interest therein, did then and there willfully, unlawfully, and feloniously marry one Victoria Hedges, a female person, she the said Victoria Hedges, being then and there a mixed-breed Indian woman of the half blood and a member of the Yankton Sioux tribe of Indians, and her, the said Victoria Hedges, then and there had for his wife, he, the said Joseph Nimrod, being then and there an Indian of the Yankton Sioux tribe of Indians, and he, the said Joseph Nimrod being then and there a married man, having been theretofore, and on the 17th day of September, A. D. 1905, at the city of Valentine, Cherry county, Nebraska, and outside of an Indian reservation, lawfully married to one Caroline Douville, who was thereafter known as Caroline Nimrod, and who was then and there a mixed-breed Rosebud Indian and a resident of the Rosebud Indian reservation in South Dakota, she, the said Caroline Douville, being then and there on the 1st day of November, 1909, alive and the bonds of matrimony and the marriage between him, the said Joseph Nimrod, and her, the said Caroline Douville being then and there undissolved, the same never having been dissolved, terminated, or annulled by any court having competent jurisdiction, and that he, the said Joseph Nimrod, at the time of his said marriage with her, the said Caroline Douville, had been alloted land on the Yankton Indian reservation in South Dakota by the United States, and the said allotted land had prior thereto been patented to him by the United States under and in accordance with the provisions of the act of Congress approved February 8, 1887, entitled 'An act to provide for the allotment of lands in severalty to Indians on the various reservations and to ex-

tend the protection of the laws of the United States and the territories over the Indians and for other purposes,' and in accordance with an act of Congress. approved February 28, 1891, amending the said act of February 8, 1887, entitled 'An act to amend and further extend the benefits of the act approved February 8, 1887, entitled "An act to provide for the allotment of land in severalty to Indians on the various reservations and to extend the protection of the laws of the United States over the Indians and for other purposes," ·' and that he, the said Joseph Nimrod, was born within the territorial limits of the United States, and that he, the said Joseph Nimrod, at the time of said marriage with her, the said Victoria Hedges, was under the supervision of the United States Indian agent at Greenwood, South Dakota, the same being the agency maintained by the United States for the benefit of the Yankton tribe of Sioux Indians, and that he, the said Joseph Nimrod, prior to the time of his said marriage to the said Caroline Douville, had voluntarily taken up within the limits of the state of South Dakota his residence separate and apart from any tribe of Indians within the United. States and had adopted the habits of civilized life and was then and there a citizen of the United States and of the state of South Dakota." To this information the defendant demurred upon the grounds (1) that the alleged facts stated in the said information do not constitute a public offense; (2) that from the facts alleged in said information, if any crime or public offense was committed the same was not committed within the jurisdiction of this court. The said demurrer was sustained, and the state appeals.

[1] It is the contention of appellant that by reason of the defendant having taken land in severalty under the act of Congress of February 8, 1887 (the Dawes Act), and also having voluntarily taken up within the limits of the state of South Dakota his residence separate and apart from any tribe of Indians within the United States and adopted the habits of civilized life, he thereby became a citizen of the United States and of the state of South Dakota, and amenable to all the laws of the state, both civil and criminal. We are inclined to the view that appellant is right in this contention. It is contended by respondent that, inasmuch as it appears from the information that defendant is an Indian, and that the offense was committed by one Indian against

another Indian within the boundaries of the Yankton Indian res-
ervation, the United States has exclusive jurisdiction of the of-
fense.   There is much seeming conflict of authority on this ques-
tion, but a careful examination of the decisions with the un-
derlying reason, upon the particular facts of each case, removes
much of such conflict.   One of the best considered cases is that of
State v. Columbia George, 39 Or. 127, 65 Pac. 604. · The defend-
ant was a Umatilla Indian, and it was held that the provisions of
the Dawes Act do not apply to the Umatilla Indians because the
allotments on the Umatilla reservation were not made under the
provisions of the Dawes Act, but under the provisions of another
special act not containing like provisions as to citizenship and
amenability of the allottees to the state laws.   The court said:
"The language of said first clause of section 6 (Dawes Act) 'that
upon the completion of said allotments and the patenting of the
lands to the said allottees,' has reference to the allotments and
allottees under the act, and none other, and hence does not compre-
hend Indian allottees under special acts and therefore cannot affect
the Umatilla Indians."   Also, in this Columbia George Case, in
discussing the provisions of the Dawes Act, the learned court
draws the plain distinction between Indian allottees who have
voluntarily taken up their residence separate and apart from the
Indian tribe and adopted the habits of civilized life and those who
still retain to some degree the tribal relation, with the plain in-
ference that those who have taken allotments under the Dawes
Act, and have wholly abandoned the tribal relation, and have
adopted the habits of civilized life would be amenable to the state
laws.   Section 6, Act Feb. 8, 1887 · (the Dawes Act), provides
that, upon the completion of said allotments and the patenting of
the lands to said allottees, each and every member of the respective
bands or tribes of Indians to whom allotments have been made
shall have the benefit of and be subject to the laws, both civil and
criminal, of the state or territory in which they may reside, and
every Indian born within the territorial limits of the United States
who has voluntarily taken up, within said limits, his residence
separate and apart from any tribe of Indians therein, and has
adopted the habits of civilized life, is hereby declared to be a
citizen of the United States, and is entitled to all the rights, privi-
leges, and immunities of such citizens.   In construing this act in

relation to the commission of crimes by one Indian against another, in the state of North Dakota (U. S. v. Kiya [D. C.] 126 Fed 879), the United States court said: "The language that such Indians 'should be subject to the laws, both civil and criminal, of the state or territory in which they reside,' is as plain and comprehensive as it could well be made. It could not have been the intention of Congress to render these Indians subject generally to the criminal laws both of the state and the nation. The language quoted plainly makes them amenable to the criminal laws of the state, and thereby removes them from the plane of national penal legislation, unless such legislation is by express provision in particular cases made applicable to them." Also see the cases of State v. Williams, 13 Wash. 335, 43 Pac. 15, and State v. Howard, 33 Wash. 250, 74 Pac. 382. In the first of these cases the Supreme Court of Washington said: "Our investigation of the authorities leads us to conclude that an Indian who has severed his tribal relations may be prosecuted in the courts of this state without regard to whether the place of the commission of the offense is within or without the limits of a reservation." In the Howard Case, referring to this part of the decision in the Williams Case, the Supreme Court of Washington again said: "While the above language may not have applied to the facts of the case then under discussion, yet, based upon our discussion herein, and upon authorities cited in that opinion, we do not believe that it was an erroneous statement of the law. We do not believe it was the intention of Congress that an Indian without tribal relations who resides among the white people of the state and is amenable to the laws thereof can go within an Indian reservation and commit a crime against another Indian, and then assert that the court of the state cannot try him for the crime. It has been often held that the state courts can try white men for crimes committed within a reservation, and we can see no reason in principle why the jurisdiction of the state shall not likewise extend to an Indian who is not allied with any tribe, and who is not therefore a subject of guardianship by the United States." While these two last cited cases are not based expressly upon the provisions of the Dawes Act, yet the Dawes Act was in force at the time of their rendition. The case of United States v. Celestine, 215 U. S. 291, 30 Sup. Ct. 93, 54 L. Ed. 195, is cited by appellant, but under the

Columbia George Case the Celestine Case is not applicable to Indian allottees under the Dawes Act, the defendant in that case being a Tulalip Indian holding an allotment of land in severalty, not under Act Feb. 8, 1887, but under Treaty March 16, 1854, 10 Stat. 1043. In view of the fact that the information alleges defendant to be an allottee under the Act Feb. 8, 1887, and that he has voluntarily taken up within the limits of this state his residence separate and apart from any tribe of Indians, and has adopted the habits of civilized life, we are of the opinion that he is amenable to the general ciriminal laws of this state, as to all criminal offenses, excepting only where the acts of Congress by express provisions, in particular cases have made the laws of the United States applicable to such Indians as he.

[2] It is also contended by respondent that inasmuch as the crime of bigamy is not mentioned in the special act of Congress of February 2, 1903 (Act Feb. 2, 1903, c. 351, 32 Stat. 793), providing "That the Circuit and District Courts of the United States for the District of South Dakota are hereby given jurisdiction to hear, try, and determine all actions and proceedings in which any person shall be charged with the crime of murder, manslaughter, rape, assault with intent to kill, arson, burglary, larceny, or assault with a dangerous weapon, committed within the limits of any Indian reservation in the state of South Dakota," it was intended that Indians should not be liable to prosecution for the offense of bigamy. According to the decision in United States v. Kiya, supra, if the allottee under the Dawes Act is amenable to the general criminal laws of the state, except where Congress has by express legislation, in particular cases, provided otherwise, it would seem to leave no room for doubt but what respondent was still liable to prosecution for bigamy under the state law. It would seem to necessarily follow that, if respondent is amenable to the criminal laws of the state by being an allottee under the Dawes Act, he is amenable to all the criminal laws of the state except where Congress has expressly legislated otherwise in particular cases. This is one of the particular cases where Congress has not legislated otherwise. Bigamy is one of the offenses created by the general criminal laws of the state. If an Indian in this state is exempt from prosecution for bigamy for such cause, for the very same reason he would be exempt from prosecution for for-

gery, embezzlement, incest, obtaining property by means of false pretenses and all other crimes under our statute not mentioned in this special act of February 2, 1903. It will be observed that this act of February 2, 1903, provides, "in which any person shall be charged with the crime of murder," etc., thereby making the said act apply to all persons whomsoever, whether Indians or whites. It does not purport to be limited to Indians only. There is no distinction between whites and Indians so far as the operation of this law is concerned. We are not prepared to concede that a white man could not be successfully prosecuted for bigamy although committed on an Indian reservation.

The judgment of the lower court sustaining the demurrer to the information is reversed, and the cause remanded for further procedure.