607 P.2d 426

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Ralph Joseph ALLAN, Defendant-Appellant.**

**No. 12685.**

Supreme Court of Idaho.

Feb. 29, 1980.

Jerrold E. Park, St. Maries, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Arthur J. Berry, Deputy Attys. Gen., Boise, for plaintiff-respondent.

DONALDSON, Chief Justice.

This is an appeal by Ralph Joseph Allan, a Quinault Indian, from a conviction for bribery which was committed within the boundaries of the Coeur d'Alene Indian Reservation in Kootenai County, Idaho. We reverse Allan's conviction and in so doing, hold that the state had no jurisdiction to try the defendant for the offense charged.

In April, 1975, the Kootenai County Prosecuting Attorney filed an information against Allan, charging him with the crime of bribery of a county officer (I.C. § 18–1309), a felony. In particular, Allan was accused of offering Kootenai County Deputy Sheriff Lars C. Hanson the sum of $100 for the purpose of securing immunity from arrest for a Connie Ray Lesarte. Allan moved to dismiss the information filed against him on the grounds that the state lacked jurisdiction over him because he is an Indian and the alleged offense occurred on the Coeur d'Alene Indian Reservation. The magistrate denied Allan's motion to dismiss on the grounds that Allan, being a member of the Quinault Tribe of Indians, was a nontribal Indian while on the Coeur d'Alene Reservation and had no different status than any other "sojourner."

Allan renewed his motion to dismiss the information in the district court. The motion was denied upon the district court's determination that the Coeur d'Alene Indians could not "enact laws governing the conduct of persons other than Coeur d'Alene Indians upon the Coeur d'Alene Indian Reservation." Alternatively, the district court held that Allan was an "emancipated" Indian as a result of leaving the Quinault Reservation and taking up residence on the Coeur d'Alene Reservation. Allan's subsequent application for writ of review was denied.

Allan was tried by a jury and found guilty of bribery of a county officer. On May 26, 1977 he was sentenced to five years imprisonment, which sentence was commuted to one year. His sentence was then suspended and he was placed on probation. Allan timely filed an appeal challenging the judgment of conviction on the grounds that the district court had no jurisdiction over the alleged offense.

In support of this jurisdictional challenge Allan relies upon the Code of Tribal Offenses (the Code). Allan argues that the Code applies to any person of Indian descent who is a member of any recognized Indian Tribe under federal jurisdiction. Since he meets these requirements, Allan argues that the Code applies to him and that it takes jurisdiction of this matter out of the hands of the state.

The undisputed facts, as stipulated to by the parties, include the following:

1. The defendant, Ralph Joseph Allan, is of Indian descent and substantial Indian blood; is an enrolled member of the Quinault Tribe of Indians, being enrollee No. 12 on the official tribal roll.

2. The Quinault Tribe of Indians is a federally recognized tribe.

3. The defendant inherited a share in his late mother's allotment, which allotment is being administered by the Bureau of Indian Affairs on defendant's behalf.

4. The offense of which Allan was convicted occurred adjacent to U.S. Highway 95 in the city of Worley, Idaho, which city is located entirely within and upon the Coeur d'Alene Indian Reservation.

5. At the time the offense occurred, on April 11, 1975, Allan was residing in Worley, Idaho upon the Coeur d'Alene Indian Reservation.

On appeal, we address the issue of whether Allan may be considered an Indian for jurisdictional purposes in light of the fact that he was not living on the Quinault Reservation but was living on the Coeur d'Alene Reservation. We note at the outset that the determination of these issues by other courts has not been an uncomplicated one, nor has it been one always marked by uniformity. See Clinton, "Criminal Jurisdiction over Indian Lands: Journey Through A Jurisdictional Maze," 18 Ariz.L. Rev. 503 (1976); Goldberg, "Public Law 280: The Limits of State Jurisdiction Over Reservation Indians," 22 U.C.L.A.L.Rev. 535 (1975).

In this case, we need not consider where jurisdiction over Allan properly lies in the event that the state does not have jurisdiction. We need only concern ourselves with whether the State of Idaho had jurisdiction over Allan. Both the magistrate and district court regarded Allan as a non-Indian for jurisdictional purposes and held that he was subject to state prosecution.

■ Where the jurisdiction of an accused depends upon his status, his status is a question of fact to be determined by the evidence, and the burden of proof is on the government to sustain the jurisdiction of the court by evidence. 42 C.J.S. Indians § 83 at 803; Lucas v. United States, 163 U.S. 612, 617, 16 S.Ct. 1168, 1170, 41 L.Ed. 282 (1896). Under the facts as stipulated, Allan is recognized racially as an Indian. Thus, if Allan is not recognized jurisdictionally as an Indian, some reason must be advanced by the state for this contention.

The magistrate determined that Allan, "as a Quinault Indian no longer residing on that reservation . . . is, while on the Coeur d'Alene Indian Reservation, a non-Indian and subject to the jurisdiction of the courts of the State of Idaho. . . ." The record indicates that Allan argued that he was not emancipated, but the magistrate chose to find that statement as not binding upon the court. Apparently, the magistrate found Allan to be emancipated on the basis of his move from the Quinault Reservation to the Coeur d'Alene Reservation. Similarly, the district court concluded that the state had jurisdiction over Allan based on the record "showing herein that defendant is an emancipated Indian. The record shows that defendant has left his tribal reservation and tribal associations and affiliations with the Quinault Tribe and is a resident of and upon the Coeur d'Alene Indian Reservation."

■ However, the courts have used no single factor to determine when emancipation has occurred—rather, a totality of the circumstances approach has been adopted. Clinton, supra at 517–18. Emancipation may occur where the Indian has severed his connection with the tribe to which he belonged, or where he has taken on the habits of the white man. People v. Carmen, 43 Cal.2d 342, 273 P.2d 521, 525 (1954); see State v. Attebery, 110 Ariz. 354, 519 P.2d 53 (1974); State v. Campbell, 53 Minn. 354, 55 N.W. 553 (1893). Thus, in order for the state to prove that Allan was "emancipated," all these factors must be considered.

As appellant argues, however, it is evident from the record that no finding of fact was made with regard to Allan's emancipa-

tion or his status as a sojourner. The district court heard no evidence in the case. It merely reviewed the magistrate's determination that Allan, "as a Quinault Indian no longer residing on that reservation . . is, while on the Coeur d'Alene Indian Reservation, a non-Indian. . . ." The magistrate rejected Allan's denial of emancipation solely on the basis of his residence. The district court did likewise stating that the record indicated that Allan had severed his tribal affiliations and associations. These conclusions obviously were not based on the totality of the circumstances approach which has long been recognized in resolving the question of emancipation.

■■ The record before us shows that Allan has not severed his relations with the Quinault Tribe. As stipulated by the state, Allan is of Indian descent and substantial Indian blood; he is an enrolled member of the Quinault Tribe of Indians; he has inherited a share of his late mother's allotment, which is being administered by the Bureau of Indian Affairs. The only indication in the record of Allan's emancipation is the fact that he resided on a reservation other than the Quinault Reservation. This fact, standing alone, is insufficient to prove emancipation. *See Fox v. Bureau of Revenue*, 87 N.M. 261, 531 P.2d 1234 (1975); *see also, Makah Indian Tribe v. Clallam County*, 73 Wash.2d 677, 440 P.2d 442, 444 (1968); *State v. Attebery, supra; Clinton, supra* at 517–18. The lower court thus erred in concluding that Allan was emancipated. As a non-emancipated Indian, Allan is not subject to state prosecution.

In addition, there is nothing in the record to indicate that the state proved or attempted to prove that Allan was emancipated, other than its stipulation that Allan lived off the Quinault Reservation. While it is possible that the state attempted to make such a showing at trial, we have not been provided with a transcript of the trial as a part of the appellate record. We may not pass upon the validity of such proceedings where they are not made a part of the record. *See State v. Tisdel*, 94 Idaho 329, 333, 487 P.2d 692, 696 (1971). In the ab-

sence of evidence indicating that Allan was emancipated, we hold that the state failed to carry its burden of proof on the issue of jurisdiction. *Lucas v. United States, supra.* We thus reverse the decision of the district court and remand with instructions to set aside the conviction and dismiss the information for lack of subject matter jurisdiction.

BAKES, McFADDEN and BISTLINE, JJ., and SCOGGIN, J., Pro Tem., concur.

McFADDEN, Justice, specially concurring.

The state of Idaho has no inherent jurisdiction to regulate activities which take place upon Indian reservations within its boundaries. The Commerce Clause of the United States Constitution reserves to the United States Congress the right to regulate commerce with the Indian Tribes, U.S. Const. Art. I, § 8, cl. 3, and the U.S. Supreme Court has held that this establishes Indian Tribes as separate political entities. In 1832 Chief Justice Marshall applied this principle to an attempt by the state of Georgia to exercise dominion over the Cherokee Indian Reservation:

"The Cherokee nation . . . is a distinct community, occupying its own territory . . . in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and within the acts of Congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States." *Worcester v. Georgia*, 6 Pet. 515, 561, 8 L.Ed. 483 (1832).

The concept of tribal sovereignty enunciated by C. J. Marshall remains intact today:

"Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251, 254 (1959).

*See also Fisher v. District Ct. of Sixteenth Jud. Dist.*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).

In this case, however, the state claimed that because it took control over all lands within the described boundaries of the state at the time of admission to the union, and because the Coeur d'Alene Reservation is within those boundaries it must therefore have criminal jurisdiction over the reservation unless that jurisdiction has been specifically withdrawn. Yet federal law in force at the time expressly withheld from the Territories all jurisdiction over Indian reservations within their borders. 23 R.S. §§ 1839–40 (1887). And the Idaho constitution expressly recognizes that the Indian lands within the boundaries of the state "shall *remain* under the absolute jurisdiction and control of the congress of the United States." Idaho Const. Art. 21, § 19 (emphasis added); *Mahoney v. State Tax Comm'n*, 96 Idaho 59, 62, 524 P.2d 187, 190 (1974). Nothing in the bill which admitted Idaho to the Union indicates an intent on the part of the Congress to confer the jurisdiction it had previously expressly withheld and the state had previously expressly eschewed. Indeed, in passing the Idaho admission bill Congress would have been mindful of another famous United States Supreme Court case which had been decided three years earlier. In *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), the Court upheld the constitutionality of legislation covering offenses committed between Indians on reservations. It there said:

"These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.

The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." 118 U.S. at 384–6, 6 S.Ct. at 1114, 30 L.Ed. at 231.

If I accept the state's argument of inherent sovereignty over the Indians, I am hard pressed to explain the function of 67 Stat. 588 (1953) (P.L. 280), which offers to the states the opportunity to assume jurisdiction over Indian reservations in various enumerated areas. Idaho accepted this offer by enacting I.C. §§ 67–5101 to 5103 in 1963. (The state did not there assert jurisdiction over the offense with which Allan is here charged). If the state already possessed inherent jurisdiction, why was it necessary for it to enact the sections above mentioned? The answer is that the inherent jurisdiction did not exist. As a leading commentator on Indian law puts it, "[s]tate law does not apply to Indian affairs except so far as, and to the extent that, the United States gives or has given its consent." Cohen, Federal Indian Law 501 (1966). This case makes it clear that our recognition of this principle in a civil context applies as well to criminal jurisdiction. *See Boyer v. Shoshone Bannock Tribe*, 92 Idaho 257, 441 P.2d 167 (1968).

Thus, absent Congressional or treaty provisions to the contrary, jurisdiction over matters arising on Indian reservations remains with the tribes. *United States v. Quiver*, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916); *Iron Crow v. Oglala Sioux*

*Tribe of Pine Ridge Reservation*, 231 F.2d 89 (1956); 18 U.S.C. § 1152 (1948). One example of Congressional limitations is found in 18 U.S.C. § 1153 (1948), the Major Crimes Act, which reserves exclusive jurisdiction in federal courts over certain enumerated major crimes (bribery is not one of them).

In addition 18 U.S.C. § 1152 (1948) extends the jurisdiction of federal courts, and applies the general laws of the United States, to Indian reservations. One of the "general laws" of the United States is 18 U.S.C. § 13 (1948), the Assimilative Crimes Act, which applies to all federal enclaves. The act comes into play when a person in an enclave performs an act which is not violative of federal law, but which violates the law of the state in which the enclave is situated. In such a case, the person may be prosecuted in federal court for a violation of the state law, which is for this purpose assimilated into the federal criminal code. The Assimilative Crimes Act applies to Indian reservations. *Williams v. United States*, 327 U.S. 711, 713–14, 66 S.Ct. 778, 90 L.Ed. 962 (1946). Thus, even though bribery of a county official is not included in the federal criminal code, the provisions of I.C. § 18–1306 would be assimilated under 18 U.S.C. § 13, and Allan would be charged in federal court. The federal court's jurisdiction is exclusive. 18 U.S.C. § 3231 (1948). *In re Carmen's Petition*, 165 F.Supp. 942, 948 (N.D.Cal.1958).

18 U.S.C. § 1152 contains language of exception, however. The general laws of the United States (and, through the Assimilative Crimes Act, the provisions of relevant state laws) do not apply to reservations when the offense complained of is one "committed by one Indian against the property or person of another Indian . . ." 18 U.S.C. § 1152. This exception reflects the prevailing notion that jurisdiction of purely Indian affairs, arising on the reservation, lies with the tribe. It has been read by the United States Supreme Court to place jurisdiction over offenses involving only Indians, arising on reservations, with the tribe; and, conversely, to place jurisdiction over offenses involving only non-Indians with the States. *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1882); *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896); *New York ex rel. Ray v. Martin*, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946). The question of whether Allan is an "Indian" for jurisdictional purposes is thus pertinent to more than just the question of whether the state has jurisdiction.[1]

It is a relatively simple question: whether the fact that an enrolled racial Indian is living on reservation land which is not reserved for the tribe of which he is a member makes him a non-Indian for jurisdictional purposes.

The generally recognized test of Indian status for jurisdictional purposes was enunciated in *Ex parte Pero*, 99 F.2d 28 (7th Cir.

---

1. Finding that Allan is an Indian, however, would not finally resolve the competition for jurisdiction between federal government and tribe. First, the statutory scheme which establishes federal jurisdiction seems to address only crimes which involve a victim, not discussing crimes like Allan's which arguably have no victim. Thus, if Allan be considered an "Indian," jurisdiction might lie with the tribe even though the attempted bribery was of a non-Indian. *Ex parte Mayfield*, 141 U.S. 107, 11 S.Ct. 939, 35 L.Ed. 635 (1891); *United States v. Quiver, supra*. On the other hand, the Supreme Court has recently indicated, in extremely oblique fashion, that the tribe may not have jurisdiction over non-members. In *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Court held that tribal courts have no jurisdiction to try "non-

Indians." In dicta in a later case, the Court suggested that this holding extended as well to "non-members." *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087–8, 55 L.Ed.2d 303, 314 (1978). At the time of Allan's offense, however, the Coeur d'Alene tribe was still governed by a "C.F.R." court, and the rulings in *Oliphant* and *Wheeler* are limited to "tribal" courts. The Coeur d'Alene tribe now operates under a tribal court. *See Oliphant, supra*, 435 U.S. at 196, n. 7, 98 S.Ct. at 1014, n. 7, 55 L.Ed.2d at 214, n. 7 (1978). As the majority opinion indicates, it is not this court's province to resolve the conflict between federal and tribal jurisdiction. But as the discussion above shows, state jurisdiction is not inherent, and may not be established simply by casting doubt on the correctness of other possible forums.

1938). That case involved the murder of a non-Indian trader on the Bad River Indian Reservation by Moore, who was an Indian by race, but was not enrolled with any tribe and had no permanent affiliation with any reservation. The court offered three possible tests for Indian status: "(1) preponderance of blood, (2) habits of the person, and (3) substantial amount of Indian blood plus racial status in fact as an Indian." 99 F.2d at 31. Because of Moore's racial status, and because "he resided on the [Bad River] reservation and maintained tribal relations with the Indians thereon," 99 F.2d at 30, the court felt he met all of the tests, and held that jurisdiction in the state courts was improper. *See*, Clinton, Criminal Jurisdiction over Indian Lands: Journey through a Jurisdictional Maze, 18 Ariz.L. Rev. 503, 515–20 (1976).

I believe the majority opinion is correct in its holding that the establishment of Allan's racial status as an Indian shifted the burden to the state to show that he should not also be treated as an "Indian" for criminal jurisdictional purposes. *State v. Phelps*, 19 P.2d 319, 321 (Mont.1933). The cases suggest that the state might have carried this burden in one of two ways: first, by showing of some special activity undertaken by the United States government; second, by establishing Allan's personal emancipation.

## I SPECIAL GOVERNMENT ACTIVITY

Over the years, the United States Congress has taken a wide variety of actions which have affected the status of Indians. In 1887, for example, it passed the Dawes Allotment Act, 24 Stat. 389 (1887), by which members of Indian tribes were made eligible for allotments of land from the federal government. The land they selected was set aside for their use, and held in trust by the United States for a period of twenty-five years. At the end of this period they were patented a fee title to the property. The act specifically stated that at the time of the fee transfer the patentee would become a citizen of the state in which the land was located, with all the rights and responsibilities attendant. It is hardly surprising that state courts have regularly asserted jurisdiction over offenses committed by Dawes Act patentees, even for offenses committed within the bounds of the reservation. *State v. Lott*, 21 Idaho 646, 123 P. 491 (1912); *State v. Big Sheep*, 75 Mont. 219, 243 P. 1067 (1926); *State v. Monroe*, 83 Mont. 556, 274 P. 840 (1929); *State v. Bush*, 195 Minn. 413, 263 N.W. 300 (1935). Where the land is still held in trust by the government, however, state jurisdiction is improper. *State v. Phelps, supra*. One case has even held that transfer of the patent in fee did not make the patentee subject to state jurisdiction. *State v. Nimrod*, 30 S.D. 239, 138 N.W. 377 (1912).

The government might also act to confer jurisdiction on the state by terminating the tribe's recognized status. In *U. S. v. Heath*, 509 F.2d 16 (9th Cir. 1974), for example, the defendant was a Klamath Indian, who was subject to the Klamath Termination Act, 25 U.S.C. § 564, *et seq.* The court felt that the defendant's tribe's termination made her a non-Indian for jurisdictional purposes. *See also People v. Ketchem*, 73 Cal. 635, 15 P. 353 (1887). A state may also apparently acquire jurisdiction over a tribe of Indians by way of independent agreements with the tribe. See, *e. g., People ex rel. Schuyler v. Livingstone*, 123 Misc. 605, 205 N.Y.S. 888 (Sup.Ct.1924); 67 Stat. 588 (1953) (P.L. 280); I.C. §§ 67–5101–03 (1963). As mentioned above, no such government activity has been shown in this case.

## II PERSONAL EMANCIPATION

The cases also suggest that a racial Indian may become subject to state jurisdiction by voluntarily abandoning legal status as an Indian. Absent an overt statement of intent, there is no agreed-upon equation for determining whether such an emancipation has taken place. Living off of the reservation, and taking up a non-Indian lifestyle has been held to bear on the question.[2] In *State v. Attebery*, 110 Ariz. 354, 519 P.2d 53

---

2. The cases uniformly regard this factual issue as pertinent, despite the fact that the reservation system itself imposed a non-Indian lifestyle on many tribes. See *Clinton, supra* at 519.

(1974), for example, the defendant was accused of raping his ten-year-old sister-in-law, who was a non-Indian. The offense allegedly took place on the Gila River Indian Reservation. Attebery had apparently come to the reservation with a travelling show, and had no ongoing contact with the tribe there. He testified that his father had been part Cherokee, but that he had never lived on the Cherokee Reservation. In fact, with the exception of one three-month period in which he had lived on an Apache Reservation, he had never lived on any Indian reservation. Inasmuch as he apparently did not have a substantial percentage of Indian blood, and had no recognition as an Indian, the court understandably was unpersuaded that the Arizona courts should decline jurisdiction. Similarly in *State v. Howard*, 33 Wash. 250, 74 P. 382 (1903), the defendant was accused of murder on the Puyallup Reservation, but because he had never lived on the reservation, nor maintained any association with members of his own tribe, and had in fact been living "among white people, and away from any Indian tribe or reservation," 74 P. at 383–4, the state considered him a non-Indian for jurisdictional purposes. In *State v. Campbell*, 53 Minn. 354, 55 N.W. 553 (1893), one of the two defendants had married a non-Indian and was living off the reservation. The state asserted jurisdiction over her.

Only one case has been found in which an Indian living on a reservation which belonged to a tribe of which he was not a member was held subject to state jurisdiction for an offense involving a non-Indian on the reservation. *People ex rel. Schuyler v. Livingstone*, 123 Misc. 605, 205 N.Y.S. 888 (Sup.Ct.1924), involved third-degree assault of a non-Indian boy committed on a road running through the Onondaga Reservation in New York. The defendant was an Oneida Indian living on the Onondaga Reservation, and the court held that jurisdiction properly lay in the state courts. It is true, as the state in this case urges, that the judge there regarded the defendant as a "sojourner." But it is just as clear that it also based its decision on the very unusual

relationship between the state of New York and the Onondagas and Oneidas, both of which were part of the "Six Civilized Nations" of Indian tribes. The court noted that the state of New York had entered some 30 treaties with the Onondagas, independent of the government of the United States. It relied on this language from an earlier New York case:

> "It seems to me reasonably clear . . . that . . . the Onondagas [are] . . . a nation dependent upon and owing allegiance to the state of New York, occupying lands over which the state has the right of preemption." *George v. Pierce*, 85 Misc. 105, 148 N.Y.S. 230, 235 (1914).

Right or wrong, it is apparent to me that the judge in *Schuyler* relied on facts which are not present in the case before this court.

On the other hand, numerous cases exist in which the court has regarded an Indian living off his home reservation, yet on the reservation of another tribe, as an "Indian" for jurisdictional purposes. In a case interpreting the term "Indian" in the Major Crimes Act, the South Dakota Supreme Court recently said:

> "In cases involving the Federal Court's jurisdiction over certain major crimes, the Act has never been interpreted to refer only to Indians residing on the reservation which was the situs of the offense." *Cook v. State*, 88 S.D. 102, 215 N.W.2d 832, 833 (1974).

And in *United States v. Burland*, 441 F.2d 1199 (9th Cir. 1971), *cert. denied* 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1977), the court upheld federal jurisdiction under 18 U.S.C. 1152 in a case involving check forgery on the Fort Peck Indian Reservation. In that case the defendant did not even reside on the Fort Peck Reservation, but was instead a member of and resident on the Flathead Reservation. In *Application of Monroe*, 55 Wash.2d 107, 346 P.2d 667 (1959), the Washington Supreme Court granted the petition for habeas corpus of a Blackfoot-Cree Indian convicted in the Washington courts of grand larceny on the Yakima Indian Reservation. The ninth circuit has also held that the Arizona state

**926**

courts have no jurisdiction to extradite a Cheyenne Indian living on the Navajo Reservation in Arizona. *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir. 1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970).

Finally, in a case which includes a thorough discussion of the issue, the New Mexico Supreme Court recently held that the state had no right to tax a member of the Comanche Tribe who was living and working on the Navajo Reservation in New Mexico. *Fox v. Bureau of Revenue*, 87 N.M. 261, 531 P.2d 1234 (1975). *See also Mahoney v. State Tax Comm'n*, 96 Idaho 59, 524 P.2d 187 (1974).

To allow the state of Idaho to assert criminal jurisdiction over a person of substantial Quinault Indian blood, duly enrolled in that tribe, who has not been shown to have taken any steps to achieve emancipation besides residing on the Coeur d'Alene Reservation, would be to encroach on the fundamental right of Indians to self-government, and on the domain of federal law. With the above clarifications, I therefore join the majority opinion.