**Albert DURO, Petitioner–Appellee,**

v.

**Edward REINA, Chief of Police, Salt River Department of Public Safety, Salt River Pima–Maricopa Indian Community, et al., Respondents–Appellants.**

**No. 85–1718.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1985.

Decided July 9, 1987.

As Amended June 29, 1988.

Richard B. Wilks, Phoenix, Ariz., for respondents-appellants.

John Trebon, Phoenix, Ariz., for petitioner-appellee.

Rodney B. Lewis, Sacaton, Ariz., Edward G. Maloney, Jr., Seattle, Wash., for amici curiae.

Before CHOY, SNEED and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

The question before us is whether an Indian may be subject to the criminal jurisdiction of the court of a tribe of which neither he nor his victim was a member. The district court ordered officials of an Indian tribe to discharge appellee from custody and to abstain from further criminal prosecution. We conclude that the tribe properly asserted criminal jurisdiction over appellee because he is an Indian, albeit an Indian enrolled in a different tribe. We therefore vacate and remand.

## I

## FACTS AND PROCEEDINGS BELOW

Appellee Albert Duro, petitioner below, is an enrolled member of the Torrez–Martinez band of Mission Indians. Duro was born in Riverside, California. He has lived all but one year of his life outside of his tribal reservation. From approximately March 1984 to approximately June 15, 1984, Duro resided within the Salt River Indian Reservation (Reservation). During this time, Duro lived with his girlfriend in her family home. His girlfriend is a member of the Salt River Pima–Maricopa Indian Community (Community or tribe). Duro worked for the PiCopa Construction Company. The Community owns the company. However, the company does not require its employees either to reside within the Reservation or to be members of the Community.

The Community is a federally recognized tribal entity that exercises authority over the Reservation. Duro is not eligible for membership in the Community. Appellant Edward Reina, respondent below, is Chief of Police of the Community's Department of Public Safety. Appellant the Honorable Relman R. Manuel, Sr., respondent below, is Chief Judge of the Indian Community Court (tribal court).

On June 18, 1984, criminal complaints against Duro were filed in both the tribal court and the United States District Court for the District of Arizona. The tribal court complaint charged Duro with discharge of a firearm within the boundaries of the Reservation, which violates the Community's Code of Misdemeanors. The district court complaint charged Duro with murder and aiding and abetting murder, which violates 18 U.S.C. §§ 2, 1111, and 1153. The complaints pertained to the same event. On or about June 15, 1984, Duro allegedly shot Phillip Fernando Brown, a fourteen year old boy, and killed him. Brown was an enrolled member of the Gila River Indian Tribe, which resides on a separate reservation.

Federal agents arrested Duro near his home in California on June 19 and moved him to the District of Arizona. On July 25, a grand jury indicted Duro for first degree murder. The district court dismissed the indictment without prejudice on the motion of the United States. Duro was then placed in the custody of the Salt River

Department of Public Safety. On October 19, the trial court denied Duro's motion to dismiss for lack of criminal jurisdiction. Duro petitioned the district court for a writ of habeas corpus and/or a writ of prohibition. The court granted the requested relief on January 14, 1985. Appellants timely appealed from the judgment.

## II

## STANDARD OF REVIEW

 Our review of a district court's decision on a petition for a writ of habeas corpus is de novo. *Chatman v. Marquez*, 754 F.2d 1531, 1533–34 (9th Cir.)., *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985). We review for an abuse of discretion the district court's decision to issue a writ of prohibition. The district court had jurisdiction over this case under the habeas corpus statute, 28 U.S.C. § 2241(c)(1) & (3). Therefore the court could issue auxiliary writs in aid of its jurisdiction "in its sound judgment," within the limits set by Congress. *United States v. New York Tel. Co.*, 434 U.S. 159, 172–73, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273, 63 S.Ct. 236, 239, 87 L.Ed. 268 (1942)); *see Mead v. Parker*, 464 F.2d 1108, 1112 (9th Cir.1972).

## III

## DISCUSSION

This case brings before us an issue of first impression: whether the criminal jurisdiction of a tribal court extends to an Indian who is not a member of the tribe, if he is accused of committing an offense against another nonmember Indian on the tribe's reservation. This issue concerns one of the uncharted reaches of tribal jurisdiction and presents a troubling choice between recognizing new restrictions on tribal sovereignty on the one hand, and placing an additional jurisdictional liability upon Indians not members of the tribe whose jurisdiction is in question.

In resolving questions of tribal sovereignty, we ordinarily are guided by those tribal powers historically exercised, the will of Congress as expressed in treaty and statute, and a considerable body of decisional law. Such sources, however, are of little aid in resolving the present controversy. The exercise of tribal criminal jurisdiction over nonmember Indians is virtually without historical precedent. This is not because such power did not theoretically reside in the tribes, but rather because circumstances, for other reasons, did not give rise to its exercise. The circumstances giving rise to the instant case have their roots in the present displacement of many Indian tribes, the resultant heterogeneity of present day reservation populations, and the increasing prevalence and sophistication of tribal courts. Our reliance in turn on statute and case law is restrained by the indiscriminate use by Congress and the courts of the terms "Indian" and "non-Indian"—"Indian" frequently has been used to denote "tribal member," while "non-Indian" has served as a synonym for "nonmember." Having acknowledged the complexity and moment of the question before us, we turn to its resolution.

### A. *Oliphant v. Suquamish Indian Tribe*

At the outset we face the question of whether *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed. 2d 209 (1978), controls this case. In that case, two non-Indians were charged with committing crimes on a reservation. The Supreme Court ruled that the tribal court did not have criminal jurisdiction over them.[1] The Court's opinion explicitly re-

---

1. In a recent decision, *Greywater v. Joshua*, 846 F.2d 486 (8th Cir.1988), the Eighth Circuit concluded that the Devils Lake Sioux Tribal Court did not have criminal jurisdiction over nonmembers of the Devils Lake Sioux Tribe.

The Eighth Circuit acknowledged that the Supreme Court in *Oliphant* held that the Suquamish Tribal Court lacked authority to exercise criminal jurisdiction over non-Indians and that Congress had not explicitly terminated the Devils Lake Sioux Tribe's authority to prosecute nonmember Indians. *Greywater* acknowledges that 18 U.S.C. § 1152 may seem to indicate that Congress' use of the term "Indian" was meant to include all Indians regardless of tribal affiliation and while acknowledging the sovereign

fers only to non-Indians. The Court never used the term "nonmember." However, the Supreme Court in one subsequent dissent and one subsequent opinion describe *Oliphant* as excluding nonmember Indians as well from the criminal jurisdiction of the tribal courts. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 171–3, 102 S.Ct. 894, 919–20, 71 L.Ed.2d 21, 50–52 (1982) (Stevens, J. dissenting). This case only concerned the Indian tribe's authority to impose a mining severance tax on *non-Indians* who were mining on the reservation. The majority opinion on occasion, and for no apparent reason, uses the term "nonmember" when discussing the power of the tribe to tax "non-Indians." *Id.*, 102 S.Ct. at 903–5. This change in terms has no relevance to the decision. It is clear that the Court is discussing the tribe's authority to tax "non-Indian" miners not "nonmembers."

Justice Stevens' dissent in addressing the authority of the tribe to tax the non-Indian lessees who produce oil and gas from within the tribe's reservation in dicta miscasts *Oliphant* as holding that tribes "have no criminal jurisdiction over crimes committed by nonmembers within the reservation." *Id.* at 919. In his analysis of the power of the tribe to tax, Justice Stevens interchanges the terms "nonmember" and "non-Indian." The majority rejected his analysis that the power of an Indian tribe to exclude nonmembers was the basis for imposing a

tax on the nonmembers, *Id.* at 903, 919, 920.

In *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978), Justice Stewart in dictum stated that *Oliphant* stands for the proposition that nonmembers cannot be tried in tribal courts. The term "nonmember" was used throughout the *Wheeler* opinion, however, nonmember status was not in issue as Wheeler was a member of the Navajo tribe, who was tried by the Navajo tribal court for a Navajo tribal code violation. At issue was not the jurisdiction of tribal courts but the possible double jeopardy effect of a prior tribal court conviction in a federal rape prosecution. The indiscriminate use of the term "nonmember" throughout the *Wheeler* opinion, 435 U.S. at 322–28, 98 S.Ct. at 1085–89, amplifies the point that Justice Stewart's statement is merely dictum. To the contrary two other Supreme Court opinions describe *Oliphant's* holding as limited to non-Indians. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 853–55, 105 S.Ct. 2447, 2452–53, 85 L.Ed.2d 818 (1985) (tribal court power to exercise civil subject matter jurisdiction over non-Indians); *Washington v. Confederated Tribes*, 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980).[2]

It appears that the Court has not used the terms non-Indian and nonmember Indian precisely.[3] The holdings of the cases

---

power of tribes to punish offenses against tribal law by members of a tribe found that federal preemption of a tribe's jurisdiction to punish its members for infraction of tribal law would detract substantially from tribal self-government. However, the Eighth Circuit ultimately found that the Devils Lake Sioux Tribe's exercise of criminal jurisdiction over nonmember Indians is beyond what is necessary to protect the rights essential to the tribe's self-government and is inconsistent with the overriding interest of the federal government in ensuring that its citizens are protected from unwarranted intrusions upon their personal liberty. For the reasons expressed in this amended opinion, we do not find the Eighth Circuit's reasoning persuasive.

**2.** A review of several of the authorities cited in the *Oliphant* opinion fortifies the point that its application is limited to the lack of tribal court criminal jurisdiction over non-Indians not nonmember Indians. E.g. *Ex Parte Kenyon*, 14

F.Cas. 353 (W.D.Ark.1878) ("[p]etitioner was born of white parents, had left his domicile in the Indian county and gained domicile in the state of Kansas."); 2 Op.Atty.Gen. 693 (1834) (Attorney General concludes that the Choctaw tribal courts have no jurisdiction over white citizens nor over Negro slaves owned by white citizens.); *Criminal Jurisdiction of Indian Tribes Over Non–Indians*, 77 I.D. 113 (1970) (Solicitor General of the Department of Interior concludes that Indian tribes do not possess criminal jurisdiction over non-Indians).

**3.** A similar inconsistency pervades the opinions of this court. *Compare, e.g., Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 478 (9th Cir.1985) (tribes lack inherent power to punish non-Indians for criminal acts, but presumably have that power with regard to nonmember Indians) *with, e.g., United States v. Johnson*, 637 F.2d 1224, 1230 (9th Cir.1980) (inherent tribal sovereignty includes power to punish "tribal of-

cited do not depend on making that distinction with regard to *Oliphant*. We give little weight to these casual references. Certainly we will not extend the literal holding in *Oliphant* on the basis of them alone.

We turn next to the reasoning in *Oliphant* to determine whether the holding extends to nonmember Indians as well as to non-Indians. The tribal court traced its authority to try non-Indians to the tribe's retained inherent powers of government over the reservation. 435 U.S. at 196, 98 S.Ct. at 1014. The Court rejected this argument. First, it identified a historical shared presumption on the part of Congress, the executive branch, and the lower federal courts that tribal courts do not have the power to try non-Indians. Second, it examined the particular treaty signed by the Suquamish for indications that the tribe had ceded criminal jurisdiction to the federal government. Finally, it determined in the light of precedent that the exercise of criminal jurisdiction would be inconsistent with the tribe's dependent status.

Applying the *Oliphant* analysis to Duro's case, we note first that the historical evidence is equivocal on the question of whether tribal court jurisdiction extends to nonmember Indians. There are indications that the executive branch and courts assumed that tribal courts may try crimes committed by any Indian, whether or not he is a tribe member. Collins, *Implied Limitations on the Jurisdiction of Indian Tribes*, 54 Wash.L.Rev. 479, 479 n. 5 (1979) (citing 25 C.F.R. § 11.2(c) (1978); *United States v. Burland*, 441 F.2d 1199, 1200 n. 1 (9th Cir.), *cert. denied*, 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1971); *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683, 686 (9th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970)). One commentator has implied that non-Indians and nonmembers have the same status. The implication was derived from an analysis of statutes that allow states to assume criminal and civil jurisdiction over Indian country with the consent of the tribe occupying the particular Indian country. 25 U.S.C. §§ 1321, 1322 and 1326. We do not agree with that implication.[4]

---

fenders," but presumably not nonmember Indians, for violation of criminal laws). Indeed, individual opinions are internally inconsistent on this point. *See Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 596 n. 9, 598 (9th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); *Cardin v. De La Cruz*, 671 F.2d 363, 364, 366 (9th Cir.) (*Oliphant* eliminates criminal jurisdiction only over non-Indians; yet, if extended to civil cases, it would "eliminate altogether any tribal jurisdiction over persons not members of the tribe"), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Authors of earlier opinions might have used "nonmember Indian" and "non-Indian" as synonyms. At a minimum, they did not distinguish carefully between the two categories. Therefore these opinions are not helpful in resolving this case, in which the distinction between nonmember Indian and non-Indian is crucial. *See Williams v. Clark*, 742 F.2d 549, 555 n. 7 (9th Cir.1984) (whether a tribe may exercise criminal jurisdiction over nonmembers is an open question), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985).

**4.** *See* Comment, *Jurisdiction over Nonmember Indians on Reservations*, 1980 Ariz.St.L.J. 727, 746–48.

The comment only postulates that nonmember Indians and non-Indians be treated the same. The comment acknowledges that changes in Indian treaty provisions in the 18th and early 19th centuries make Congress' intent uncertain on the issue of federal versus tribal criminal jurisdiction. These language changes might indicate, the comment suggests:

"[T]hat Congress meant to assume federal jurisdiction over offenses between nonmember Indians and tribal members in the same manner it had previously assumed federal jurisdiction over offenses between non-Indians and tribal members. *On the other hand* Congress may have intended the change of language to merely reflect the applicability of a treaty to only the signatory tribes." *Id.* at 738 (emphasis added).

At the same time the comment proposes that by examining treaty provisions, the intent of Congress to assume jurisdiction over nonmember Indians is made clear. Yet later the author, examining federal statutes (25 U.S.C. §§ 1321, 1322 and 1326) states that Indian and nonmember Indians can only be implicitly equated.

The problem is that it is indeed too difficult to get a finger on the pulse of Congress' intent in this area. Absent an express Congressional assumption of jurisdiction we feel safe in concluding that tribal courts retain criminal jurisdiction in these situations.

As for *Oliphant*, the comment acknowledged several times that it is limited to non-Indians.

Perplexed by these ambiguities in the historical record, we turn to the Court's third argument in *Oliphant*. "By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress." 435 U.S. at 210, 98 S.Ct. at 1021. This overriding sovereignty argument was the core of the Court's opinion.[5] *Id.* at 206, 208, 98 S.Ct. at 1019, 1020 (explaining the lesser importance of the other arguments). At first blush, the theory of overriding sovereignty appears to limit the jurisdiction of tribal courts only with respect to non-Indians, to whom the tribes originally submitted. Tribal courts would retain jurisdiction over nonmember Indians. However, all Indians are now United States citizens. 8 U.S.C. § 1401(a)(2). As citizens, Indians as well as non-Indians can claim to be exempt from the criminal jurisdiction of tribes, which are sovereign entities subordinate to the United States. This suggests an equal protection claim which we address later. It is evident, however, that the reasoning of *Oliphant*, like its language, does not dispose of this case.

Rather, what is more dispositive of this case is the federal criminal statutory scheme[6] and its treatment of crimes committed by Indians. 18 U.S.C. § 1151, et seq.

■ That statutory scheme subjects individuals to federal prosecution "by virtue of their status as Indians." *United States v. Antelope*, 430 U.S. 641, 642, 97 S.Ct. 1395, 1396, 51 L.Ed.2d 701 (1977). For purposes of the federal criminal statutes the impor-

tant inquiry is whether a particular defendant is a member of a tribe that has a special relationship with the federal government, not whether the defendant happens to have a relationship with the tribe governing the reservation where the offense occurred. Accordingly, in *United States v. Heath*, 509 F.2d 16 (9th Cir.1974) we held that a Klamath Indian whose tribe had been federally "terminated" could not be federally prosecuted for a violation of 18 U.S.C. §§ 1111 and 1153 for killing an enrolled member of the Warm Springs Indian Tribe on the Warm Springs Reservation. The reason was the absence of a federal relationship between the Klamaths and the United States as a result of the termination of federal supervision over the Klamath Tribe by the Klamath Termination Act; 25 U.S.C. § 564 et seq. *Id.* at 19. Under 18 U.S.C. § 1153 jurisdiction is based upon a crime committed by one Indian against another Indian within the Indian country. It was not suggested that federal jurisdiction was lacking because the Klamath was on the reservation of the Warm Springs Tribe, where she enjoyed no tribal relationship.

Granted, the discussion so far has been concerned with federal jurisdiction and not tribal. However, it cannot be ignored that the two are interwoven. Thus in *Arizona ex rel Merrill v. Turtle, supra*, we held that Navajo tribal sovereignty precluded Arizona from arresting a Cheyenne Indian on the Navajo Reservation for the purpose of extraditing him to Oklahoma. We recognized, by analyzing the terms of the Treaty of 1868 between the Navajos and the United States that a tribe has the right to exercise power over the Indian residents of its reservation, without distinction as to

---

5. Commentators have sharply criticized the Court's use of historical authority in *Oliphant* to support its first two arguments. Collins, *supra*, at 490–99; Note, *Indians—Jurisdiction—Tribal Courts Lack Jurisdiction over Non–Indian Offenders*, 1979 Wis.L.Rev. 537, 540–51. The third argument is not vulnerable to these attacks, which further enhances its importance.

6. In addition to the statutory scheme, the regulatory scheme promulgated by the Department of Interior's Bureau of Indian Affairs establishing Courts of Indian Offenses states that those courts "shall have jurisdiction over all offenses ... when committed by *any* Indian, within the

reservation or reservations for which the court is established ..." 25 C.F.R. § 11.2(a) (1987) (emphasis added). We find it instructive that the regulations fail to limit jurisdiction of these courts only to offenses committed by Indians of the tribe for which the particular court is established. (The regulations deem an Indian for purposes of these courts "to be *any* person of Indian descent who is a member of any recognized Indian tribe now under Federal jurisdiction." 25 C.F.R. § 11.2(c) (1987). There is no distinction made as to the status of nonmember Indians.)

whether the Indian was a member of the tribe or not. *Id.* at 686.

The structure of criminal jurisdiction in Indian country, as far as it relevant here, is easily discerned. Tribal courts generally handle petty crimes by Indians against Indians and victimless crimes by Indians. However, certain "major" crimes by Indians are dealt with in federal court pursuant to the Major Crimes Act, 18 U.S.C. § 1153. That statute punishes "Indians" who commit crimes in Indian country. That usually means that the crime is committed on some tribe's reservation "and the fair inference is that the offending Indian shall belong to *that or some other tribe* ... [the statute's] effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation." *United States v. Kagama,* 118 U.S. 375, 383, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886) (emphasis added). The statute has *never* been restricted in its application to Indians who are members of the "host" tribe.

■ Crimes by Indians against non-Indians and crimes by non-Indians against Indians are punishable under 18 U.S.C. § 1152. That statute makes applicable in Indian country those criminal laws applicable in areas of exclusive federal jurisdiction with several exceptions.[7]

As 18 U.S.C. § 1152 has been applied it has also been assumed that references to "Indian" meant any Indian not just Indians who were members of the host tribe. In *United States v. Burland,* 441 F.2d 1199 (9th Cir.), *cert. denied,* 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1971) we applied the statute to a member of the Confederated Salish and Kootenai Tribes who committed a crime on the Flathead Reservation. We noted, citing *Kagama, supra,* that Bur-

land did not argue "that the statute was inapplicable to him because he was a member of a tribe other than the local tribe and was visiting from another reservation." *Id.* at 1200, n. 1.

Furthermore, in discussing the Major Crimes Act, we held in *United States v. Johnson,* 637 F.2d 1224 (9th Cir.1980) that except for the crimes specifically enumerated in the Act, "the general rule is that tribal courts have retained exclusive jurisdiction over all crimes committed by Indians against other Indians in Indian country." *Id.* at 1231. Again we declined to make a distinction between member and nonmember Indians.

The cases discussing the federal criminal statutory scheme clearly indicate that if Congress had intended to divest tribal courts of criminal jurisdiction over nonmember Indians they would have done so. Absent such divestment it is reasonable to conclude that tribal courts retain jurisdiction over crimes committed by Indians against other Indians without regard to tribal membership.

### B. *Equal Protection*

■ The district court ruled that the tribe's exercise of criminal jurisdiction over Duro denied him the equal protection of its laws in violation of the Indian Civil Rights Act, 25 U.S.C. § 1302.[8] The court said that the distinction between nonmember Indians and non-Indians "is based solely upon race." It recognized that racial classifications ordinarily must withstand strict scrutiny. Finally, it concluded that "[t]he discriminatory enforcement of tribal criminal jurisdiction in this case cannot be upheld under either the rational basis or strict

---

7. The statute does not apply to offenses committed by one Indian against the person or property of another Indian, nor to an Indian committing any offense in the Indian country who has been punished by the local law of the tribe or to any case whereby treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

8. The Indian Civil Rights Act is the sole source of Duro's equal protection claim. Neither the Bill of Rights nor the Fourteenth Amendment

limits the authority of Indian tribes. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). The equal protection provision of the Act extends to any person, even a non-Indian, within the jurisdiction of the tribe. Schultz, *The Federal Due Process and Equal Protection Rights of Non-Indian Civil Litigants in Tribal Courts After Santa Clara Pueblo v. Martinez,* 62 Denv.L.Rev. 761, 773–75 (1985). Therefore Duro may invoke it despite his status as a nonmember.

scrutiny standards." We consider in turn each step of the district court's reasoning.

### 1. *Racial classification*

■ The Supreme Court has made clear that "federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications."[9] *United States v. Antelope,* 430 U.S. 641, 645, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977). The district court accepted this proposition with respect to legislation concerning federal recognized Indian tribes, which are political rather than racial groups. *See Morton v. Mancari,* 417 U.S. 535, 553, n. 24, 94 S.Ct. 2474, 2484, n. 24, 41 L.Ed.2d 290 (1974). Therefore the district court recognized that tribal courts may exercise criminal jurisdiction over member Indians even though non-Indians are exempt. However, it viewed the extension of tribal court criminal jurisdiction to nonmember Indians as based on race alone.

■ The district court erroneously assumed that tribal courts extend their criminal jurisdiction to Indians on the basis of race. Who is an Indian turns on numerous facts of which race is only one, albeit an important one. The criminal jurisdiction of federal courts also turns, in part, on who is an Indian. *See, e.g.,* 18 U.S.C. §§ 1152, 1153. Federal courts identify Indians by reference to an individual's degree of Indian blood and his tribal or governmental recognition as an Indian. *United States v. Broncheau,* 597 F.2d 1260, 1263 (9th Cir.), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). Members of terminated tribes do not qualify as Indians, regardless of their race. *United States v. Heath,* 509

F.2d 16, 19 (9th Cir.1974). Enrolled members of tribes qualify as Indians if there is some other evidence of affiliation, such as residence on a reservation and association with other enrolled members. *United States v. Indian Boy X,* 565 F.2d 585, 594 (9th Cir.1977), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). A person of mixed blood who is enrolled in a recognized tribe or otherwise affiliated with it may be treated as an Indian. *Ex parte Pero,* 99 F.2d 28, 31 (7th Cir.1938), *cert. denied,* 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939); R. Flowers, *Criminal Jurisdiction Allocation in Indian Country* 6 (1983). For the purpose of federal jurisdiction, Indian status is "based on a totality of circumstances, including genealogy, group identification, and lifestyle, in which no one factor is dispositive." Clinton, *Criminal Jurisdiction over Indian Lands: A Journey Through a Jurisdictional Maze,* 18 Ariz.L.Rev. 503, 518 (1976). Tribal courts may define their criminal jurisdiction according to a similarly complex notion of who is an Indian.

■ In this case, Duro is enrolled in a recognized tribe, although not in the Community. He was closely associated with the Community through his girlfriend, a Community member, his residence with her family on the Reservation, and his employment with the PiCopa Construction Company. These contacts justify the tribal court's conclusion that Duro is an Indian subject to its criminal jurisdiction. We stress that his is not purely a racial determination. Indeed, the record does not describe Duro's ancestry, so we do not know his degree of Indian blood.

---

9. This case does not concern federal legislation, but rather the tribe's exercise of its retained sovereign powers. Therefore the equal protection standard of the Indian Civil Rights Act applies, not the implicit equal protection requirement of the Fifth Amendment. *See supra* note 8. We are satisfied that the equal protection standard of the Indian Civil Rights Act is no more rigorous than its Fifth Amendment counterpart. The Indian Civil Rights Act "selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal governments." *Santa Clara*

*Pueblo v. Martinez,* 436 U.S. 49, 62–63, 98 S.Ct. 1670, 1679, 56 L.Ed.2d 106 (1978). Congress intended to foster tribal self-determination as well as to protect individual rights. *Id.* at 62, 98 S.Ct. at 1679. If Congress altered the constitutional equal protection standard at all, it diluted it. *Howlett v. Salish & Kootenai Tribes,* 529 F.2d 233, 238 (9th Cir.1976). Our argument that the tribal court's assertion of criminal jurisdiction is valid under the implicit equal protection guarantee of the Fifth Amendment necessarily implies that it is valid under the equal protection guarantee of the Indian Civil Rights Act.

### 2. *Rational basis*

The Community wishes to extend the tribal court's criminal jurisdiction to nonmember Indians in order to better enforce the law on the Reservation. Federal prosecution of crimes on reservations has long been inadequate. *Jurisdiction on Indian Reservations, Hearing on S. 3092 Before the Senate Select Comm. on Indian Affairs,* 98 Cong., 2d Sess. 21, 27–28 (1985) (statements of Caleb Shields, Councilman, Assiniboine & Sioux Tribes, Fort Peck Reservation, Montana, and James C. Nelson, County Attorney, Glacier County, Montana); American Indian Policy Review Comm'n, *Report on Federal, State, and Tribal Jurisdiction* 37–39 (1976). Law enforcement by state officials is also undependable, American Indian Policy Review Comm'n, *supra,* at 39–40, in part because of jurisdictional uncertainties that will be discussed in the next subsection. Furthermore, treating nonmember Indians resident on the reservation differently from member residents undermines the tribal community. *See* Clinton, *Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government,* 33 Stan.L.Rev. 979, 1015–16 (1981) (criticizing treating members and nonmembers differently with regard to state taxes because it fragments the tribal community).

The district court recognized that tribal court jurisdiction over nonmember Indians would strengthen tribal authority over the reservation. But it thought this consideration was outweighed by the injustice of treating nonmember Indians differently from non-Indians. Neither nonmember Indians nor non-Indians may participate in tribal government. However, as explained above in the discussion of *Oliphant,* the Supreme Court did not exempt non-Indians from the criminal jurisdiction of tribal courts on the ground that they are excluded from tribal government. Had that been the case, non-Indians presumably would be exempt from the civil jurisdiction of tribal courts. That is not the case, however. *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987); *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959).

▮▮▮▮ We conclude that extending tribal court criminal jurisdiction to nonmember Indians who have significant contacts with a reservation does not amount to a racial classification. We further find that this policy is reasonably related to the legitimate goal of improving law enforcement on reservations. The district court's decision was in error.

### C. *A Jurisdictional Void*

▮▮▮ Our conclusion is strengthened when we consider what would happen if we ruled that Duro is exempt from tribal court criminal jurisdiction. Duro argues that because neither he nor his supposed victim was a member of the Community, they must both be treated like non-Indians for the purpose of criminal jurisdiction. Thus only a state court could have jurisdiction over Duro.[10] *See* D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 388 (1979) (citing *United States v. McBratney,* 104 U.S. (14

---

**10.** Duro's reasoning precludes federal, as well as tribal, jurisdiction over his case. Federal courts have jurisdiction over Indian defendants accused of committing enumerated major crimes against non-Indians. 18 U.S.C. § 1153. It is not clear whether federal jurisdiction preempts tribal jurisdiction over these cases. *See United States v. John,* 437 U.S. 634, 651 n. 21, 98 S.Ct. 2541, 2550, n. 21, 57 L.Ed.2d 489 (1978). Lesser crimes committed by Indians against non-Indians, as well as all crimes committed by non-Indians against Indians, are punishable under 18 U.S.C. § 1152. That section extends federal enclave law to Indian country, although not to offenses committed by an Indian against another Indian, nor to any Indian who has already been punished under tribal law. Under the Assimilative Crimes Act, 18 U.S.C. § 13, federal enclave law incorporates local state law where federal law defines no equivalent offense. *Williams v. United States,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). However, as explained in the text, the courts have created an exception from federal jurisdiction for crimes committed between non-Indians, and "it appears to be too well entrenched to be overruled." Clinton, *Criminal Jurisdiction over Indian Lands; A Journey Through a Jurisdictional Maze,* 18 Ariz.L.Rev. 503, 524–26 (1976). Therefore if courts treat Duro and his victim as non-Indians, there will be no federal criminal jurisdiction over his case.

Otto) 621, 26 L.Ed. 869 (1882)). The flaw in Duro's analysis is that state courts apparently do not exercise their criminal jurisdiction as Duro recommends. Notably, the record in this case shows no attempt to prosecute Duro in state court. At least one state court has held that it lacked jurisdiction over an Indian who allegedly committed a crime on a reservation, even though the Indian was not a member of the reservation tribe. *State v. Allan*, 100 Idaho 918, 921, 607 P.2d 426, 429 (1980). If no state court takes jurisdiction of Duro's case, there will be a jurisdiction void.

It is possible that state courts will henceforth extend their criminal jurisdiction to cases involving nonmember Indians such as Duro. But increasing state authority in Indian reservations has its own disadvantages. *See* Clinton, *State Power over Indian Reservations: A Critical Comment on Burger Court Doctrine*, 26 S.D.L.Rev. 434, 445–46 (1981) (criticizing the extension of state authority into Indian country as inconsistent with constitutional history and needlessly complex). We are fortunate to be able to avoid this dilemma.

We conclude that the tribal court had criminal jurisdiction over Duro. The district court erred in granting a writ of habeas corpus. Consequently it abused its discretion by issuing a writ of prohibition in aid thereof.

VACATED.

SNEED, Circuit Judge, Dissenting:

The majority has substantially revised its opinion since it first appeared at 821 F.2d 1358–64 (9th Cir.1987). It is, therefore, appropriate that my dissent be revised, particularly in light of the fact that the intervening deliberations have provided to me additional insights that have strengthened my resolve to dissent.

In my original dissent, I stated *"Oliphant* should govern this case." *Id.* at 1364. That remains true, but now I am more ready to concede that it need not. The underpinning of its holding was the history of the relationship between the United States and Indian tribes generally and the Suquamish Tribe in particular.

Emphasis was placed upon the fact that the tribes seldom, if ever, exercised criminal jurisdiction over non-Indians prior to the middle of this century. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 196–97, 98 S.Ct. 1011, 1014–15, 55 L.Ed.2d 209 (1978). The same undoubtedly cannot be said with respect to the exercise of criminal jurisdiction over Indians not members of the adjudicating tribe. Therefore, I concede that the *ratio decidendi* of *Oliphant* is not applicable to this case.

Nonetheless, *Oliphant* exists. Its holding that neither the existing residual tribal sovereignty nor a grant of power by Congress authorized the exercise of criminal jurisdiction by a tribe over a non-Indian leaves open the question whether either supports the exercise of such jurisdiction over a nonmember Indian. I believe neither does. My reasons, succinctly stated, are as follows:

(1) *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), makes clear that retained tribal sovereignty exists to govern the behavior of tribal members. No necessity exists to expand its reach.

(2) No federal statute explicitly grants to tribal authorities the power to exercise criminal jurisdiction over nonmembers. 18 U.S.C. § 1152 does not exclude such a grant but it does not require it. Nor does existing case law require it.

(3) To subject nonmember Indians to tribal jurisdiction discriminates against the nonmember both actually and potentially. This discrimination is not justifiable.

I now shall address each of these positions in greater depth.

### I.

### RETAINED TRIBAL SOVEREIGNTY

To understand the scope of *United States v. Wheeler, supra,* it is helpful to point out that both *Oliphant v. Suquamish Indian Tribe, supra,* and *Wheeler* originated in this circuit and that each constituted a reversal of this circuit's prior decision. In *Oliphant,* this circuit extended

criminal tribal jurisdiction to non-Indians, while in *Wheeler* it made any conviction by a tribal court of any crime over which it had jurisdiction a bar to prosecution by the United States of the greater offense of which the tribally prosecuted lesser included offense was a part. The circuit court in *Wheeler* undoubtedly was influenced by the expansion of tribal authority recognized by *Oliphant.* To reach its result in *Wheeler*, this court reasoned that the United States and the Navajo Tribe should not be treated as dual sovereigns for double jeopardy purposes.

It was this proposition against which much of the Supreme Court's opinion in *Wheeler* is directed. It must be remembered that the Court no doubt considered *Wheeler* and *Oliphant* contemporaneously because they were argued within two days and decided within sixteen days of one another. Having decided *Oliphant* by rejecting the expansion of the authority of tribal courts over crimes by non-Indians, it would not have been surprising to have found the Court in *Wheeler* using "non-Indians" as the limit of the reach of the "retained sovereignty" upon which it relied in *Wheeler.* It could have done so by referring to past tribal practices which many assert drew no distinctions between members and non-members insofar as punishment for crimes on the reservation were concerned.

It did not do so, however. Throughout the opinion the focus is upon the tribe's retained sovereignty with respect to its *members.* Two examples of this focus are as follows:

Moreover, the sovereign power of a tribe to prosecute its *members* for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and *nonmembers* of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667–668 [94 S.Ct. 772, 777–778]; *Johnson v. M'Intosh,* 8 Wheat. 543, 574 [5 L.Ed. 681]. They cannot enter into direct commercial or governmental relations with foreign nations. *Worcester v. Georgia,* 6 Pet. 515, 559 [8 L.Ed. 483]; *Cherokee Nation v. Georgia,* 5 Pet., at 17–18; *Fletcher v. Peck,* 6 Cranch 87, 147 [3 L.Ed. 162] (Johnson, J., concurring). And, as we have recently held, they cannot try *nonmembers* in tribal courts. *Oliphant v. Suquamish Indian Tribe, ante,* [435 U.S.] p. 191 [98 S.Ct. p. 1011].

435 U.S. at 326, 98 S.Ct. at 1087 (emphasis added).

In sum, the power to punish offenses against tribal law committed by Tribe *members,* which was part of the Navajos' primeval sovereignty, has never been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority. It follows that when the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government.

*Id.* at 328, 98 S.Ct. at 1088 (emphasis added) (footnotes omitted). Others appear in the margin.[1]

---

**1.** It is undisputed that Indian tribes have power to enforce their criminal laws against *tribe members.* Although physically within the territory of the United States and subject to ultimate federal control, they nonetheless remain "a separate people with the power of regulating their internal and social relations." *United States v. Kagama, supra,* 118 U.S. at 381–382, 6 S.Ct. at 1112–1113; *Cherokee Nation v. Georgia,* 5 Pet. 1, 16, 80 L.Ed. 25. Their right of internal self-government includes the right to prescribe laws applicable to *tribe members* and to enforce those laws by criminal sanctions. *United States v. Antelope,* 430 U.S. 641, 643 n. 2, 97 S.Ct. 1395,

1397 n. 2; *Talton v. Mayes,* 163 U.S. 376, 380, 16 S.Ct. 986, 988, 41 L.Ed. 196; *Ex parte Crow Dog,* 109 U.S. 556, 571–572, 3 S.Ct. 396, 405–406, 27 L.Ed. 1030 (1883); see 18 U.S.C. § 1152 (1976 ed.), *infra,* n. 21.

435 U.S. at 322, 98 S.Ct. at 1085 (emphasis added) (footnote omitted).

The Indian tribes are "distinct political communities" with their own mores and laws, *Worcester v. Georgia,* 6 Pet., at 557; *The Kansas Indians,* 5 Wall. 737, 756, which can be enforced by formal criminal proceedings in tribal courts as well as by less formal means.

The lesson to be drawn appears to me to be clear. Retained tribal sovereignty exists with respect to members only. What powers over nonmembers, Indian or not, that exist have their source in federal law be it an act of Congress, a federal court decision, or an administrative decree of a federal agency. While the decision of the majority will clothe some tribes with authority to subject nonmember Indians to its criminal jurisdiction, it is clear that its source is not retained jurisdiction, but rather the court's mandate. The upshot is that the majority wishes to enhance slightly tribal powers while I do not.

## II.

### DO FEDERAL STATUTES GRANT TO TRIBES POWER TO IMPOSE CRIMINAL PUNISHMENT ON NONMEMBER INDIANS?

The majority devotes substantial space to arguing that federal statutes have given tribal courts the power to subject nonmember Indians to its criminal jurisdiction. *See* pp. 12–16 [Brunetti draft]. It asserts that certain cases have assumed that such jurisdiction exists and that "the structure of criminal jurisdiction in Indian country," p. 14[B.d.], also suggests that this is true.

I shall address each case cited by the majority. Only a portion of a sentence appearing in *United States v. Antelope*, 430 U.S. 641, 642, 97 S.Ct. 1395, 1396, 51 L.Ed.2d 701 (1977), was quoted by the majority, apparently to make the point that federal criminal statutes focus on "Indians" without the qualifier "tribal member" or "non-tribal member." The full sentence is:

> They have a significant interest in maintaining orderly relations among their *members* and in preserving tribal customs and traditions, apart from the federal interest in law and order on the reservation. Tribal laws and procedures are often influenced by tribal custom and can differ greatly from our own. See *Ex parte Crow Dog*, 109 U.S. at 571 [3 S.Ct. at 405].
>
> Thus, tribal courts are important mechanisms for protecting significant tribal interests. Federal pre-emption of a tribe's jurisdiction to punish its *members* for infractions of tribal law would detract substantially from tribal self-government, just as federal pre-emption of state criminal jurisdiction would trench upon important state interests.

*Id.* at 331–32, 98 S.Ct. at 1090–91 (emphasis added) (footnotes omitted).

> The question presented by our grant of certiorari is whether, under the circumstances of this case, federal criminal statutes violate the Due Process Clause of the Fifth Amendment by subjecting individuals to federal prosecution by virtue of their status as Indians.

The "circumstances of this case" were that members of the Coeur d'Alene tribe murdered a non-Indian in the Coeur d'Alene reservation and sought to be tried under Idaho law rather than federal law pursuant to the Major Crimes Act, 18 U.S.C. § 1153. The Court rejected the defendants' constitutional argument. It was not necessary to address whether any distinction between members of the Coeur d'Alene tribe and nonmembers existed. To have said each time the word "Indians" was used, "including both members and nonmembers," would have been absurd. The case simply is not relevant to the issue before us.

The majority itself recognized the marginal significance of *United States v. Heath*, 509 F.2d 16 (9th Cir.1974), to the issue before us. I would go further and assert that it has no relevance whatsoever. The issues before the court in *Heath* were whether the United States could indict an Indian of a terminated tribe under the Major Crimes Act, 18 U.S.C. § 1153,[2] and, if

2. 18 U.S.C. § 1153 reads in relevant part as follows:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, rape, involuntary sodomy, felonious sexual molestation of a minor, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses within the exclusive jurisdiction of the United States.

not, whether the attempt to do so was prejudicial error when the crime charged was murder, as defined in 18 U.S.C. § 1111, and committed in "Indian country" and, thus, subject to federal jurisdiction under the Federal Enclaves Act, 18 U.S.C. § 1152.[3] This court held that the defendant, as an Indian of a terminated tribe, must be treated as any other non-Indian citizen of the state. As a result, 18 U.S.C. § 1153 could not provide a basis for federal jurisdiction. It applies, this court held, only when the "Indian who commits [certain crimes] against the person or property of another Indian or other person," § 1153, is an Indian as to whom the United States has a "special responsibility." *Heath*, 509 F.2d at 19. A person, who happens to be an Indian and was once a member of a now terminated tribe, could have been indicted, as could have been any other person, under 18 U.S.C. § 1152. The court concluded that under these circumstances the indictment under 18 U.S.C. § 1153 was not prejudicial error.

The issue of tribal court jurisdiction over a nonmember Indian was irrelevant to the question that *Heath* raised. Had the *Heath* court believed that the tribal court had criminal jurisdiction over a nonmember it would have affected neither its reasoning nor its result. The crucial issue, as seen by *Heath*, was whether the United States had a "special responsibility" with regard to the defendant, not whether the defendant was a member of the victim's tribe. The majority says it did not occur to the *Heath* court to suggest "that federal jurisdiction is lacking because the Klamath [the defendant Indian] was on the reservation of the Warm Springs Tribe, where he enjoyed no tribal relationship." [B draft p. 3] Of course, it did not. It was irrelevant. To overlook an issue that could have been controlling is significant; to refrain from addressing one that is irrelevant only mercifully saves both the reader's eyes and time.

The majority's use of *State of Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970), is a bit closer to the mark at which it is shooting. Unfortunately, a miss is a miss, however. This court, in holding that the Navajo Tribe need not accede to Arizona's effort to extradite a Cheyenne Indian resident on their reservation to the State of Oklahoma, emphasized the retained sovereignty of the Tribe. We pointed to the Treaty of 1868, the Supreme Court's decision in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the codification of the Navajo Tribe's extradition responsibilities in its Tribal Code, and the approval of that Code by the Commissioner of Indian Affairs. None of those sources of law required the Tribe to accede to Arizona's request. Indeed, the Tribal Code expressly precluded any such accession.

The case, therefore, is consistent with the existence of substantial retained sovereignty and for the purposes of the case treated members and nonmembers the same. This similarity of treatment was rooted in the 1868 Treaty that spoke of "bad men among the Indians," who committed wrongs against anyone "subject to the authority of the United States," a group that undoubtedly includes, from time to time, whites as well as nonmember Indians. But it goes no further. It simply does not address the jurisdiction of the Navajo Tribe to subject nonmembers to criminal prosecution. If one repeats "tribal sovereignty" over and over again, the hypnotic power of the phrase may lead one to conclude that such jurisdiction in a given situation exists. Reasoning, not self-hypnosis, is the way of the law, however.

---

**3.** Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

 This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

11 U.S.C. § 1152.

Enough has been said to suggest that neither 18 U.S.C. § 1152 nor 18 U.S.C. § 1153 compel the conclusion which the majority reached. The latter, the Major Crimes Act, draws into federal court "any Indian" who commits certain crimes within "Indian country." Membership within the tribe occupying the country in which the crime occurs is irrelevant. It says nothing, I repeat, about the jurisdiction of a tribal court to prosecute criminally a nonmember who commits a crime over which the tribe has jurisdiction.

The Federal Enclaves Act, 18 U.S.C. § 1152, also does not unequivocally support the majority. Its principal purpose is to extend to "Indian country" the general laws of the United States. The reach of those laws within "Indian country" clearly is unaffected by whether the offender is an Indian or a non-Indian. *See Mull v. United States*, 402 F.2d 571, 573 (9th Cir.1968), *cert. denied*, 393 U.S. 1107, 89 S.Ct. 917, 21 L.Ed.2d 804 (1969). On its face, 18 U.S.C. § 1152 also would appear not to draw a distinction between a victim who is Indian and one who is not. However, it has been long established that the statute does not embrace an offense by a non-Indian against a non-Indian even when committed in Indian country. *United States v. McBratney*, 104 U.S. (14 Otto) 869, 26 L.Ed. 869 (1882); *see New York ex rel. Ray v. Martin*, 326 U.S. 496, 500, 66 S.Ct. 307, 90 L.Ed. 261 (1946); *Mull v. United States*, 402 F.2d at 573.

An offense by an Indian against a non-Indian, on the other hand, is within the statute. *See United States v. Burland*, 441 F.2d 1199, 1203 (9th Cir.), *cert. denied*, 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1971). And it is true, as *Burland* holds, that the Indian offender need not have committed his crime within the reservation limits of the tribe of which he is a member. *Cf. United States v. Kagama*, 118 U.S. 375, 382, 6 S.Ct. 1109, 1113, 30 L.Ed. 228, 231 (1885). All that is necessary is that it have been committed in "Indian country."

The position of the majority emerges in its most forceful form when the focus is fixed upon the exceptions to 18 U.S.C. § 1152. These are (1) "offenses committed by one Indian against the person or property of another Indian," (2) "any Indian committing any offense in the Indian country who has been punished by the local law of the tribe," and (3) any offense where by treaty exclusive jurisdiction "is or may be secured to the Indian tribes respectively." Only the first would be affected by taking *Wheeler* at its word and rejecting the position of the majority. In essence, the majority argues that because there is no explicit provision for relieving the nonmember Indian from tribal jurisdiction in the first exception, he must be subject to the tribe's criminal jurisdiction. It buttresses this by pointing out, as already indicated, that 18 U.S.C. § 1152 is applicable generally without regard to whether the offender was a member of the Tribe on whose reservation the offense was committed. Thus, tribal membership, it argues, also should be irrelevant in applying the exception.

The conclusion does not follow. To disregard membership in construing the broad reach of 18 U.S.C. § 1152 *protects* Indians from possible discrimination by state courts; to disregard it construing the exception to its broad reach serves only to *enhance* the possibility of discrimination by the tribal court against a nonmember Indian. Only an incurable romantic would argue that only discrimination by state courts can exist. Finally, there is no more reason to treat the literal language of the statute as all encompassing than there was in the case of the non-Indian offense against the non-Indian. *See McBratney*, 104 U.S. 869; *New York ex rel. Ray v. Martin*, 326 U.S. 496, 66 S.Ct. 307.

I acknowledge that the exclusion of nonmember Indians from the jurisdiction of tribal courts will impose somewhat greater responsibilities on certain United States Attorneys.[4] Nonmember offenses not directed at another Indian, and not described in the Major Crimes Act, 11 U.S.C. § 1153, must be prosecuted by these officials.

---

**4.** And possibly on state prosecutors if, as has been suggested by some, "victimless" crimes by non-Indians (and nonmember Indians by the reasoning of the dissent) fall within the exclusive jurisdiction of state courts. *See* 3 Op. Off. Legal Counsel 111 (1979).

This category embraces such things as drunk and disorderly conduct.

The majority also suggests that state prosecutors and state courts may become involved in law enforcement. This concern appears to be premised on the assumption that an offense by a nonmember Indian against another Indian, which is not a major crime, would not be covered by 18 U.S. C. § 1152 were my view to prevail. Thus, the majority suggests state law enforcement would be required to fill the gap.

I suggest the majority has misread 18 U.S.C. § 1152. To exclude nonmember Indians from the Indian-against-Indian exception merely places the nonmember in the same position as a non-Indian, or an Indian for whom, as in *Heath*, the federal government has no "special responsibility." Both are subject to "sole and exclusive jurisdiction of the United States." There is no reason why a nonmember should be treated differently. To the extent the offense each commits is not proscribed by federal law, the Assimilative Crimes Act, 18 U.S.C. § 13, will import the applicable state law to be applied by federal authorities and courts.

The fear of the majority can be put this way. As they see it, an offense which is not a major one by an Indian against an Indian is excluded from federal jurisdiction when tribal jurisdiction is lacking because the offender is a nonmember. I suggest that under those circumstances the offense "escapes" the first exception to the general rule of 18 U.S.C. § 1152 but does not "escape" the broad reach of 18 U.S.C. § 1152. That is, the offense remains an offense by an Indian within Indian country and thus subject to the general laws of the United States, but, for the reason stated here, should not be considered as one committed by one Indian against another within the meaning of the first exception to 18 U.S.C. § 1152. Put more simply, the nonmember Indian should be treated as a non-Indian.

## III.

## DISCRIMINATION AGAINST THE NONMEMBER INDIAN

In my original dissent, I lumped all the discriminatory possibilities to which the majority subjected the nonmember Indian under the heading of equal protection. The majority in its original and revised opinion addresses the equal protection issue and concludes that there is a rational basis for subjecting the nonmember to tribal jurisdiction and that, in any event, in this case Duro is not being discriminated against on the basis of race.

On reflection, I have concluded that it is not essential to my position to fit the facts of this case to the analytics of the equal protection doctrines. Rather, I have employed the discriminatory possibilities this case suggests to inform my interpretation of the applicable statutes and cases. These possibilities may, but need not, rise to the level of equal protection violations. Their existence suggests, however, that wise construction of the applicable law should reduce, if not eliminate, their existence.

The heart of the issue this case presents, as this dissent already has stated, is that the majority puts the offending nonmember Indian in a position different from, and less advantageous than, that of any other class of offender. The member Indian offender is "among his own," which presumably is frequently to his benefit. The non-Indian is protected by *Oliphant, supra,* from possibly harsh treatment by a tribal court animated by a bias against all non-Indians. And the Indian no longer enjoying the "special relationship" with the federal government enjoys the same protection as does the non-Indian. Only the nonmember Indian still enjoying that "special relationship" must be subject to a tribunal that, on its face, suggests the possibility of prejudice against him.

It is not beyond the pale of proper judicial behavior to employ an interpretation of the law that eliminates this possibility. In the final analysis, the majority has suggested only two rather weak reasons for not doing so, *viz.,* to enhance tribal sovereignty and to avoid burdening U.S. Attorneys and their staffs. Inasmuch as the contribution to these ends made by the majority's approach is only marginal at

best, I would hold that the price demanded for these modest achievements is too high. Tribes would lose no meaningful sovereignty under my analysis nor would U.S. Attorneys become overburdened.

I respectfully dissent.